NORWOOD BUILDERS *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. THE CITY OF DES PLAINES, Defendant-Appellee and Cross-Appellant.

First District (5th Division) No. 83—0785

Opinion filed November 21, 1984.

910

Jack M. Siegel, of Chicago, for appellants.

Klein, Thorpe & Jenkins, Ltd., of Chicago (Arthur C. Thorpe and Patrick A. Lucansky, of counsel), for appellee.

JUSTICE LORENZ delivered the opinion of the court:

Plaintiffs appeal and defendant cross-appeals from an order declaring defendant's zoning ordinance unconstitutional as applied to plaintiffs' property and denying plaintiffs' proposed uses as being unreasonable. They seek reversal of the trial court's order.

For the reasons that follow, we affirm in part and reverse in part.

Pertinent to our consideration are the following.

Plaintiffs applied to the defendant's zoning board of appeals for rezoning of their 38-acre tract of land to permit 2.2 acres for commercial use, 16.1 acres for multifamily residential use and 19.7 for light industrial and office use. Although the zoning board recommended approval of plaintiffs' application, the defendant's city council rejected the recommendation, whereupon plaintiffs filed their complaint seeking declarations that the present zoning, as applied to their property, was arbitrary and unreasonable and that their proposed uses for their property were reasonable.

At trial, plaintiff and proposed developer Raymond Adreani testified that he acquired the subject property from the Archdiocese of

Chicago over a four-year span ending March 1981; that he had an estimated $2.2 million invested in the property; and that if successful in this action for declaratory relief, he would develop the site according to a plan prepared for him by Rolf Campbell, which would consist of office, research, industrial, commercial and multifamily residential uses.

William McCann, a realtor and appraiser, described the 38-acre subject property as located at the southeast corner of the intersection of Central and Wolf roads. There is a three-quarter acre parcel zoned as C-2 (commercial) containing an abandoned building at the corner. The balance of the property is zoned R-2 (residential) and currently vacant. The site has approximately 1,310 feet of frontage along Central Road, about 860 feet of frontage on Wolf Road extending south and about 1,200 feet along its eastern boundary. Adjoining the eastern boundary of the property in question are a city-owned parcel containing an aboveground water tank, Commonwealth Edison high-tension wires and Soo Line railroad tracks; the southern boundary adjoins land developed as M-2 (general manufacturing) and R-4 (multifamily residential). The southwestern border of the property abuts 13 single-family residences located on Polynesian Drive.

Rolf Campbell, an expert in city planning and zoning, testified that his plan consists of a commercially developed northwest corner

(2.2 acres) to be developed as compatible with the three corners surrounding it which are all zoned C-2 (commercial) and which would not exceed 30,000 sq. ft. of gross leasable area. Three three-story condominium buildings totaling 90 units will back up to this commercial area and will also be adjacent to a retention lake to be created. A series of 15, eight-unit, two-story coach manor homes will be placed throughout the remaining multi-family residential property. Seven one-story buildings, which will together not exceed 300,000 sq. ft. of office/industrial space, are proposed for the site's 19.7 acres of office/light industrial uses, three on the east side of an extended Third Avenue and four on the west side. The exact size and number of these buildings will ultimately be determined by the actual users, but the height of these buildings will not exceed 35 ft. It was Campbell's opinion that the plan itself followed the multi-use land use patterns and trends already established in the area; the plan could be laid out in accordance with all of the defendant's standards. Further, it was Campbell's opinion that the subject property's corner was correctly zoned as C-2 (commercial), but that the R-2 (single-family) classification on the remainder of the site was incorrect.

Additionally, Campbell, Ralph Martin and William McCann, plaintiffs' planning and real estate appraisal experts, testified that a mixed-use development is the highest and best use of the subject site due to the surrounding industrial, municipal, public utility, railroad, multiresidential, single-family and commercial uses which greatly affect the character of the site. They further opined that no adverse effect would occur on the property surrounding the site should plaintiffs' plan be developed; that the land between commercial and light industrial development should not be developed as single-family residential, but rather as multifamily residential; and that adequate berming will be used to separate the on-site multifamily dwellings from the on-site office/light industrial uses. Regarding the M-2 and R-4 areas to the south of the site, they opined that although this area might have been a planning mistake, the plan's proposed extension of Third Avenue north to Central Avenue would lead to the enhancement of this area. With regard to any traffic concerns, Gerald Lindgren, plaintiffs' traffic expert, testified that the Illinois Department of Transportation planned to improve both Wolf and Central roads; that the proposed development will not have a deleterious effect on adjacent roadways; that the extension of Third Avenue is needed to further disperse traffic in the area, whether the site is developed as proposed or not; and that the extension of Third Avenue will also give the industry located to the south of the site direct access to Central Road.

Defendant's experts, Gerald Estes, an architect and land planner and John Hoppe, a real estate appraiser, testified that the single-family homes in the area surrounding the subject site were uniform and well established; that single-family residential was the predominate land use of the surrounding area; and that plaintiffs' plan of development was not only a clear departure from the existing single-family residential land use, but that it would have a deleterious effect on this "established" use. They opined that the subject site, as presently zoned, was in conformity with the predominate land uses and zoning of the area; that plaintiffs' proposed uses were not compatible with the surrounding area from a planning viewpoint; and that the present single-family residential zoning represented the highest and best use of the property (with the exception of the small commercially zoned parcel) from a zoning/planning standpoint. In addition, the multifamily units located on the subject site's southeast border which lie directly across from an industrial area act as a buffer between the industry and the single-family homes located to the west of these multifamily units.

Defendant's traffic expert, Richard Beebe, testified that although he agreed with plans to extend Third Avenue, this extension would force fire trucks from the proposed fire station to drive through residential areas so as to service the industrial area located on the site's southeast border; that the traffic generated by the proposed site would be deleterious to the surrounding areas; and that plaintiff's plan for a private drive would in no way conform to the requirements for public streets, but that the city has the right to approve any proposed street plan. Further, he admitted that in doing his field work, he did not take into consideration construction work being done which could very well have substantially effected traffic backups which he testified had occurred at the intersection of Wolf and Central roads during rush hours.

Defendant's other witnesses testified that the city does lease some land under high tension wires from Commonwealth Edison for community gardens and plots; that any perceived problems between the proposed plan and the city's fire department's access to the subject site could be solved if the road south of Central Road was linked up to a road on the southern portion of the subject site; and that the existence of light industrial property to the immediate south of the subject site might possibly be a detriment to any single-family homes developed on the site.

Following closing arguments on September 16, 1982, the trial court rendered an oral opinion from the bench. Thereafter, on October

18, 1982, the trial court entered a written order, to which it appended its prior oral opinion. This order specifically held that the zoning ordinance of the city of Des Plaines, as applied to the subject property insofar as it classified the subject property under the R-2 single-family residential classification, bore no reasonable relationship to the public health, safety, morals and welfare and was arbitrary, capricious, unreasonable and void; that the denial by the city of Des Plaines of the developer's request for 2.2 acres of commercial use on the northwest corner of the subject site was also arbitrary, capricious and unreasonable, and directed the city to issue any and all permits subject to the strict requirements of the applicable ordinances to permit commercial construction containing at least 30,000 square feet under roof as proposed and testified to; and that the denial by the city of the multifamily residential and light manufacturing plans as proposed was proper. The court further directed the parties to confer on an appropriate use for the remaining unzoned property, using its oral opinion rendered on September 16, 1982, as a guide. The court retained jurisdiction for the purpose of reviewing the submission of the parties in accordance with the directions of the court, and to render such further orders in the premises as needed.

Following the trial court's rendition of its order, additional evidence was heard from by both sides. Plaintiffs presented a revised plan for the subject site which retained the original plan's commercial area of 2.2 acres (30,000 square feet of gross leasable space), but reduced the original 19.7 acres of office/research/light industrial space to 19.2 acres. The major change occurred in the multifamily residential area. In an attempt to alleviate the city's concern with the original plan where the site's manor homes abutted the 13 single-family Polynesian Drive homes on the site's southern border, the revised plan increased the original three condominium buildings to four, for a total of 120 condominium units, while at the same time decreased the number of manor homes to 10 and added 13 single-family homes which will abut the Polynesian Drive homes. In addition, 30-foot landscape berms were added to buffer the proposed office/industrial area.

With regard to this revised plan, plaintiffs' experts testified that it would have no material or adverse effect on the surrounding area; that the revised plan was the highest and best use of the subject site; that it was not deleterious to surrounding property value; and that it was a reasonable use. They further testified that all of their opinions regarding the original plan also applied to the revised plan.

The opinions of defendant's experts regarding the incompatibility of the original plan with the surrounding area, the highest and best

use of the subject site as being single-family residential, as well as the deleterious effect that this plan would have on the character of the surrounding area, were all echoed by its experts with reference to the revised plan introduced by Rolf Campbell.

Thereafter, following closing arguments, the trial court noted that it had previously struck down the single-family zoning on the site and approved the proposed expansion of the already existing commercial use on the southeast corner of Wolf and Central roads to 2.2 acres; and that the reopening of the proof in the case represented to the court an attempt to get the parties to engage in sensible innovative planning, but that it did not appear that this had taken place. Adopting and relying on its prior decision, the trial court found the revised plan's changes insufficient to justify a change in its original position that the residential and light industrial purposes were unreasonable. On March 1, 1982, the trial court issued its final judgment order. It incorporated by reference the findings it made on October 6, 1982, except as modified, and reiterated its original holding that plaintiffs' proposed use of 2.2 acres of the subject property for commercial purposes was reasonable, and that its original decision regarding the unreasonableness of the residential and light industrial uses remained unchanged, as any differences in plaintiffs' original and revised plans were insignificant. Finally, the trial court reiterated its finding that the R-2 single-family designation for the subject property was arbitrary, capricious, unreasonable and invalid.

Plaintiffs appeal that portion of the court's decision which found its proposed residential and light industrial use unreasonable. The city cross-appeals that portion of the court's order which declared the R-2 zoning designation of the subject property invalid.

OPINION

 The law in Illinois governing judicial review of zoning ordinances is well established. Zoning is primarily a legislative function, subject to judicial review only to determine "whether the power, as exercised, involves an undue invasion of private constitutional rights without a reasonable justification in relation to the public welfare." (*Exchange National Bank v. County of Cook* (1962), 25 Ill. 2d 434, 440, 185 N.E.2d 250.) A zoning ordinance is presumptively valid, and the burden of proving its invalidity falls on the one who attacks the ordinance. (*La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 428, 312 N.E.2d 625.) To overcome this presumption of validity, the challenging party must establish by clear and convincing evidence that the ordinance, as applied to their subject property, is arbi-

trary and unreasonable and bears no substantial relation to the public health, safety or welfare. (*Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 111, 324 N.E.2d 406.) The validity of a zoning ordinance is tested pursuant to the reality of the application of the specific proposed use to the property in question. (*Drogos v. Village of Bensenville* (1981), 100 Ill. App. 3d 48, 53, 426 N.E.2d 1276.) After showing that an existing zoning ordinance is invalid as to the property in question, the challenger must then show that the specific proposed use is reasonable. *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 379-80, 167 N.E.2d 406; *Mangel & Co. v. Village of Wilmette* (1969), 115 Ill. App. 2d 383, 394, 253 N.E.2d 9.

██ ■ Where it appears, from all the facts, that room exists for a difference of opinion concerning the reasonableness of a classification, the legislative judgment must be conclusive. (*Krom v. City of Elmhurst* (1956), 8 Ill. 2d 104, 107, 133 N.E.2d 1.) "However, the fact that there is a difference of opinion among the witnesses—lay and expert—, does not mean that the court must find that the reasonableness of the ordinance is debatable and, hence, uphold the ordinance. In cases of this nature, a court must expect differences of opinion. It is for the court to determine from all of the facts whether the differences of opinion are reasonable and justifiable." (*Fiore v. City of Highland Park* (1966), 76 Ill. App. 2d 62, 71, 221 N.E.2d 323.) In a trial without a jury where the testimony is contradictory, the weight to be given to that testimony is a matter for the trial court, and its findings will not be disturbed unless manifestly against the weight of the evidence. *Aurora National Bank v. City of Aurora* (1976), 41 Ill. App. 3d 239, 244, 353 N.E.2d 61.

Plaintiffs initially contend that the trial court erred in holding that the residential and office/light industrial uses proposed for the subject property were unreasonable. They further posit that this decision was inconsistent with the findings made by the trial court that the residential classification of the site was invalid.

Conversely, defendant contends that the trial court was correct in its decision that the proposed plan was unreasonable. It is defendant's position that plaintiffs have failed to set forth a specific proposed use of the subject property that is reasonable.

██ ■ As we stated earlier, courts do not possess the power to zone or rezone property since that function properly belongs to a legislative, and not a judicial, body. (*Treadway v. City of Rockford* (1962), 24 Ill. 2d 488, 493, 182 N.E.2d 219.) Since the practical effect of declaring an existing zoning ordinance invalid with respect to a particular piece of property is to leave that piece of property unzoned, the

trial court should frame its order with reference to a specific proposal before it if it finds that the contemplated use is reasonable. (*Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 379-380, 167 N.E.2d 406; *La Salle National Bank v. City of Chicago* (1970), 130 Ill. App. 2d 457, 460, 264 N.E.2d 799.) However, where the record fails to show any evidence of the use proposed, the trial court cannot frame its decree with reference to the record before it, and a declaration of invalidity will, in effect, leave the property unzoned. *Reeve v. Village of Glenview* (1963), 29 Ill. 2d 611, 616, 195 N.E.2d 188; *Dolton v. Village of Mundelein* (1967), 86 Ill. App. 2d 245, 249-50, 229 N.E.2d 681.

Before we address the reasonableness of plaintiffs' revised plan, we must first consider whether the record presents us with a proposed use specific enough to enable the trial court to frame its order. Defendant argues that plaintiffs, through their pleadings and the testimony of their witnesses, never committed themselves to any specific use for the office/light industrial portion of the subject property. It further argues that plaintiffs' witnesses testified the uses proposed would be those permitted under the city's M-2 and C-2 zoning districts and that this constitutes a request to rezone the premises according to the respective classifications, a power clearly not within the realm of the trial court.

Plaintiffs heavily rely upon *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 167 N.E.2d 406, and its companion cases, *Franklin v. Village of Franklin Park* (1960), 19 Ill. 2d 381, 167 N.E.2d 195, and *Nelson v. City of Rockford* (1960), 19 Ill. 2d 410, 167 N.E.2d 219, where our supreme court considered the undesirable consequences of leaving property unzoned by declaring the existing ordinance invalid, and empowered the trial court to avoid such consequences by framing its judgment with reference to the record before it. *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 378-79, 167 N.E.2d 406.

In *Franklin v. Village of Franklin Park*, the supreme court affirmed a lower court's decree which invalidated the village ordinance as to any zoning which prohibited commercial or light industrial use. The court rejected Franklin Park's argument that a declaration of invalidity necessarily returned the matter to the legislative body for rezoning. Citing *Sinclair Pipe Line*, the *Franklin* court held that where the evidence that was offered in the case concerned the compatibility of commercial and light industrial uses with uses on the surrounding property, "[t]he court may frame its judgment to effectuate its findings as to the rights of the parties." *Franklin v. Village of*

*Franklin Park* (1960), 19 Ill. 2d 381, 385.) This resolution avoids two problem situations: where the land is left unzoned and the plaintiff is free to use his land for uses not contemplated at trial, and where the village rezones to another classification that would still exclude most commercial and industrial uses.

In *Nelson v. City of Rockford*, plaintiffs' complaint stated their desire to utilize the subject property for such uses as were permitted in "local business districts," but also alleged their purpose to " 'construct a drive-in restaurant which would include one building for the preparation and service of food and articles incidental thereto.' " (*Nelson v. City of Rockford* (1960), 19 Ill. 2d 410, 413.) The lower court's judgment allowed plaintiffs to erect a drive-in in substantial conformity with the plaintiffs' exhibits, and restrained plaintiffs from using or building any structures not in substantial conformity with the exhibits. (*Nelson v. City of Rockford* (1960), 19 Ill. 2d 410, 413-14.) The supreme court in *Nelson* also cited the *Sinclair Pipe Line* case and stated:

> "*** the plaintiffs' proof with respect to the fitness of the property for *uses* other than those permitted under the existing ordinance centered entirely upon the specific *use* with which the judgment concerned itself. Having induced the entry of a judgment upon that basis, the plaintiffs can not object to a judgment framed to meet the proof adduced at the trial." (Emphasis added.) *Nelson v. City of Rockford* (1960), 19 Ill. 2d 410, 414.

■ Plaintiffs at bar counter with their position that they do not seek rezoning of the subject property to the defendant's M-2 classification. They strenuously argue that, through their declaratory judgment action, they seek to invalidate the ordinance in question only insofar as it prohibits the development of a 16.7-acre multifamily residential area composed of 13 single-family homes, 10 eight-unit manor home buildings and four 30-unit condominium buildings, a 2.2-acre commercial retail area in a single one-story building to include a maximum of 30,000 sq. ft. of gross leasable space and approximately 19 acres of light industrial/office and research uses in one-story buildings (maximum height 35 feet) having a maximum total floor area of 300,000 square feet, which would meet the requirements of the C-2 and M-2 classifications of the Des Plaines zoning ordinance. Further, it is plaintiffs' position that nothing in the *Sinclair Pipe Line* case, or the cases following it, required that a "plan" as opposed to a "use" must be presented in order that a decree could be framed with reference to the record before it. We agree.

We have carefully considered those cases cited by defendant and find that they do nothing to bolster its position that plaintiffs have not presented a specific use contemplated for the subject property. Although the cases relied upon by the city, *Reeve v. Village of Glenview* (1963), 29 Ill. 2d 611, 195 N.E. 188, *Harshman v. City of DeKalb* (1965), 64 Ill. App. 2d 347, 212 N.E.2d 146, and *Dolton v. Village of Mundelein* (1967), 86 Ill. App. 2d 245, 229 N.E.2d 681, correctly restate the *Sinclair Pipe Line* holding regarding the court's ability to frame its decree according to the record before it, the focus of these cases is the failure to present any substantial evidence of a specific proposed use.

■■■ We distinguish *Reeve, Harshman* and *Dolton* from the instant case. In the case at bar, we are presented with a record which clearly indicates a specific proposed use. The record is replete with testimony of plaintiffs' witnesses that they propose specific commercial (retail), residential (single-family/multi-family), and light industrial and office/research uses for the subject property, as well as with testimony regarding the compatibility of these proposed uses with those of the surrounding properties. (See *Franklin v. Village of Franklin Park* (1960), 19 Ill. 2d 381, 167 N.E.2d 195.) Plaintiff developer Andreani testified that he would develop the site in accordance with plaintiffs' exhibits 5, 16 and A, all admitted into evidence. In addition to these three plans, photographs representing the manner in which plaintiffs intended to develop the condominium and light industrial office research areas were introduced, although the trial court admitted only those photographs relating to the proposed condominium units. Our careful examination of the record leads us to conclude that the trial court misjudged the admissibility of plaintiffs' photographs depicting the Kensington Office Development, and should have allowed these photographs into evidence as they were relevant to the specific uses proposed for this area of development. Further, plaintiff Adreani's testimony that the proposed development would comply with the city's regulations of C-2 and M-2 zoning districts is in addition to the other evidence contained within the record, and can be interpreted more specifically to refer to setbacks, lot sizes and parking regulations for each classification.

■■■ In conclusion, we do not perceive this as a situation whereby the court would usurp the zoning/rezoning power inherent within the legislative branch; if this was the case, the record would speak only in terms of particular zoning classifications: C-2, R-4 or M-2. We conclude that the trial court's oral finding that no fixed "plan" exists for this proposal was against the manifest weight of the evidence, as we

find this record to contain proposed uses specific enough to have enabled the trial court to frame its decree with reference to it.

■■ We now turn to consider the reasonableness to these specific proposed uses. Both parties agree that to do so requires that we review the record in light of the well-established factors enunciated by the supreme court in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47, 145 N.E.2d 65, which are: "(1) [t]he existing use and zoning of nearby property [citations], (2) the extent to which property values are diminished by the particular zoning restrictions [citations], (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public [citations], (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner [citation], (5) the suitability of the subject property for the zoned purposes *** [citations] and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. [Citations.]" Two additional factors to be considered are: (1) the care with which the community has undertaken to plan its land use development, and (2) the evidence or lack of evidence of community need for the proposed use. *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 378, 167 N.E.2d 406.

■■ Although no single standard is determinative (*Drogos v. Village of Bensenville* (1981), 100 Ill. App. 3d 48, 54, 426 N.E.2d 1276), of paramount importance is the factor relating to the existing use and zoning of nearby properties. (*Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 381, 402 N.E.2d 719.) In this context, plaintiffs argue that the subject property takes its character from the multiple uses surrounding it, and that the proposed development is really an extension of the already existing zoning. In addition to the uses proposed for the site which abut similar external uses already established, it is plaintiffs' position that the subject site's manor homes will act as an internal buffer between the site's 13 single-family homes and four condominium buildings. Conversely, defendant argues that the subject site should remain predominately single-family residential because most of the four quadrants surrounding the site have single-family uses.

■■ We believe that the evidence presented in the instant case with respect to surrounding uses supports the trial court's findings that: (1) the subject site draws at least some of its character from the already existing industrial, multifamily and commercial uses in close proximity to the site; (2) at least a portion, if not all, of the north-

south leg of this site should be used as a logical continuation and ending of the industrial and multi-uses directly to the south and west of the north-south leg of the site; (3) the north-south leg of the site takes its character from the light industrial uses to its south, the multifamily use to its west, the high tension wire and railroad easement uses to its east and the sewage treatment uses to its north; (4) that it is logical to extend the industrial and multifamily uses north either to defendant-owned parcel or Central Avenue; and (5) that the site should not remain entirely residential by reason of the fact that there are already industrial, multifamily and commercial uses in close proximity to the property.

Defendant argues that plaintiff's development would encourage a similar type of development on the vacant land located across Central Avenue to the north of the subject site. In the present case, the trial court found Central Avenue to be an obvious zoning transition line between the subject site and all property north of Central Avenue. We agree with the trial court's finding on this point. Heavily travelled roads have often been used to make transitions between zoning uses. See *Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 381, 402 N.E.2d 719.

Although each zoning case must be decided upon its own facts (*Drogos v. Village of Bensenville* (1981), 100 Ill. App. 3d 48, 54, 426 N.E.2d 1276), defendant relies heavily upon *Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 354 N.E.2d 899, and *Chicago & North Western Ry. Co. v. City of Des Plaines* (1968), 97 Ill. App. 2d 201, 240 N.E.2d 280. We find both cases easily distinguishable from the instant case.

In *Tomasek*, the property in question was surrounded by single-family homes, campgrounds, forest preserve, a public works garage and land which was zoned M-2 (manufacturing). The *Tomasek* court found the surrounding properties residential in character, and that the plaintiffs' proposed uses would severely alter if not destroy the predominately residential quality of the neighborhood. (*Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 181.) In the present case, however, we are presented with established multifamily and light industrial uses which abut the subject site and greatly contribute to the site's mixed use characteristic.

In *Chicago & North Western Ry. Co.*, plaintiff sought an industrial use adjacent to the west of its railroad tracks. The appellate court noted that the tracks were on an embankment 6 to 10 feet higher than the property in question, and that the embankment acted as a buffer between existing industrial uses to the east and the property in

question to the west. The court characterized the westerly property as residential, and concluded that industrial use would be incompatible. (*Chicago & North Western Ry. Co. v. City of Des Plaines* (1968), 97 Ill. App. 2d 201, 207-09.) However, in the present case, we were presented with testimony that only 14 single-family building permits had been issued by defendant since 1980; that substantially all of the single-family development surrounding the subject site had been built at least 10 years prior, and that overhead power lines and railroad tracks, like those located directly to the east of the site, are more often than not considered "industrial" in nature. Further, no testimony was given by defendant's witnesses pertaining to any planned use of this power line easement area for recreational purposes. In addition, defendant's planning expert testified that, in terms of area, less than 50% of the area bound by Central, Wolf, Rand roads and the railroad tracks was single-family residential, and admitted that a heavily travelled road can form a logical division between zoned areas.

In the present case, the trial court's findings regarding the surrounding uses of the subject site indicate that plaintiffs' proposed uses were reasonable, yet after considering all factors, the trial court found these uses were unreasonable. Therefore, we must now turn to the remaining factors so as to determine whether the trial court's conclusion as to the unreasonableness of plaintiffs' proposed uses is borne out by the application of these additional factors.

██ ██ The next factor is the extent to which the value of the subject property is diminished by the zoning ordinance. Plaintiffs' expert testified that the site itself is worth approximately $1.3 million more under the revised plan. The finding by the trial court that there was no question that the present zoning restriction reduces the value of the subject site is fully supported by the record. Furthermore, in most instances in which the validity of a zoning ordinance is challenged, the property is worth more if the ordinance is not in effect. See *Grobman v. City of Des Plaines* (1975), 59 Ill. 2d 588, 595-96, 322 N.E.2d 443.

██ Defendant argues that plaintiffs' loss is self-imposed because Adreani, a skilled and knowledgeable developer, was aware of the residential zoning of the property when he purchased the land. Although it is true that a purchase in the face of a pre-existing zoning restriction is a factor to be considered (*American National Bank & Trust Co. v. City Chicago* (1964), 30 Ill. 2d 251, 195 N.E.2d 627), it is also true that a purchaser is not precluded from challenging a restriction for this reason alone. (*Bolger v. Village of Mount Prospect* (1957), 10 Ill. 2d 596, 602, 141 N.E.2d 22.) It is not merely the diminution in value that we must consider, but whether this diminution will promote

the health; safety, morals or general welfare of the public. We must also balance the relative gain to the public as compared to the hardship imposed upon plaintiffs by the zoning restriction. We will consider these points together.

Plaintiffs argue that no public good is promoted by their inability to construct the proposed development. Defendant posits that the neighbors of the site have a right to rely on its current zoning; that the traffic volumes will be detrimental; and that the density on the site will pose a problem for the adjoining community.

██ In the case at bar, several homeowners from the Polynesian Drive and Craig Manor subdivisions testified that they had purchased their single-family homes in reliance upon the single-family zoning of the subject site; they felt their own property values would diminish should the original proposed development be completed. These homeowners did not testify as to the revised plan; however, it is evident from their testimony concerning the original proposal that they were not sure what plaintiffs proposed to erect on the site. Although we can consider and respect the opinions of the surrounding homeowners, property use cannot be limited merely because neighbors so desire to because it is their belief that it might protect the value of their homes. See *Regner v. County of McHenry* (1956), 9 Ill. 2d 577, 582, 138 N.E.2d 545, and *Oak Lawn Trust & Savings Bank v. City of Palos Heights* (1983), 115 Ill. App. 3d 887, 893, 450 N.E.2d 788.

Plaintiffs' experts testified that no detriment to the value of the surrounding homes would occur, as the uses proposed by plaintiffs were already in existence in close proximity to the subject site. In contrast, defendant's experts testified that the revised proposal would lead to a detriment in the value of the surrounding properties. Specifically, its real estate expert testified that the proposed site would have a depreciating effect on the single-family homes located on the north side of Polynesian Drive, but gave no percentages of depreciation in conjunction with his opinion. Yet, these homes would back up to the site's 13 single-family homes, a plan favored by defendant's own planning expert. Further, this real estate expert opined that the existing multifamily units located across from the north-south leg of the proposed site would experience a 5-6% depreciation, a decrease from his original estimate resulting from additional berms proposed by plaintiffs which would be placed between the multifamily units and the proposed site. These estimates of depreciation were made without the benefit of appraisals.

██ With regard to defendant's concern about traffic problems, we believe there was sufficient evidence to support the trial court's

finding that there were adequate gaps along the highways and sufficient highway capacity to permit the use of Central and Wolf roads, two major arterial highways, if this property was developed as proposed. Further, there is no question that the extension of Third Avenue will provide adequate access to the proposed office/light industrial area. In addition, plaintiffs' traffic expert testified that none of the site's commercial or industrial traffic would infiltrate the existing residential areas.

■ Finally, with respect to defendant's density concerns, it argues that the regulation of density is a legitimate object of the police power. While we agree with defendant's restatement of this legal theory, our review of the record reveals that plaintiffs' planning expert testified that in the event that density requirements were not met by the proposed plan, the number of proposed units would be reduced. Further, Adreani testified that he would build the streets of the development to conform with defendant's ordinances, and would be willing to build a smaller number of units in order to comply with defendant's regulations on street construction. We therefore find defendant's concerns regarding a density problem unwarranted.

■ We next consider the fourth *La Salle* factor, which is relative gain to the public as compared to the financial hardship which present zoning imposes upon plaintiffs. As we discussed above, very little gain if any to the general public appears from the present R-2 zoning of the subject site; rather, it would appear that the public interest would be better served by the completion of this proposed development due to the increased tax base it will bring to concerned taxing districts, which will, in turn, assist these districts in spreading their costs over a much higher-valued area. In addition, the extension of Third Avenue will help promote greater traffic flow in the area. In the present case, plaintiffs have experienced a loss in the value of their property, along with an obligation to pay taxes on the site. Without a correlative public gain in the promotion of public health, safety, morals or general welfare, plaintiffs' loss in value becomes significant. *La Grange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 309, 388 N.E.2d 388.

The trial court found that the raw land itself was equally suitable for residential development as well as plaintiff's proposed development. However, we must also consider the evidence in this area in light of the experts' testimony pertaining to the costs involved in the preparation of this land for single-family dwellings. Plaintiffs' experts found the property unsuitable for single-family residential development due to the industrial development to its immediate south, the proposed extension of Third Avenue, and the municipal ownership of

the water tank and proposed fire station at the corner of Central Road and Third Avenue. They testified that because uses of the area immediately surrounding the subject site are mixed, the site itself should also be developed with mixed uses. In addition, they stated that the market for single-family homes was nonexistent and that even if the market was more favorable, the R-2 zoning of the site was still not the highest and best use; that land use conditions were not conducive to the development of 37 years of single-family dwellings; that Des Plaines was a multi-purpose community; and that it would cost the instant developer $22,000 to improve a raw lot on this site.

Defendant's experts testified that the proposed plan would have a deleterious effect on the established single-family use of the area; that the existence of light industry to the immediate south of the site might possibly be a detriment to any development of single-family homes; and that a single-family home on an improved lot within this site would have to be marketed at a cost of $152,000. Defendant's real estate expert was not familiar with any homes which had been sold in the city for that price in the last two years, and further did not believe a single-family home on this site and in this price range could sell. In addition, testimony by defendant's director of municipal development that single-family residential was the best use of this property was admittedly based on defendant's comprehensive plan, which, if proved wrong, could also negate the director's opinion. Defendant's experts' opinions as to the suitability of the site for single-family residential is contradicted by its own real estate expert's testimony that single-family homes on this site, priced at $152,000, would not sell.

■■ We next turn to consider the length of time the subject site has been vacant as zoned, considered in the context of land development in the area in the vicinity of the subject site. The record reveals that the Archdiocese purchased the site in 1955, but had never attempted to develop it as single-family residential. Although the Church never advertised the property for sale, the director of Catholic Cemeteries testified that it was "general knowledge" in the area that the property was available, and Mr. Adreani's offer was the only offer received by the Church. Further, Adreani himself advertised the site for sale "as zoned" in July and August 1980, but received no offers. He did not hold legal title to the property until 1981, and since that time, he has not listed the property with a broker. However, defendant's own real estate expert admitted his doubts as to the ability of a developer to sell any single-family homes on this site for the requisite $152,000 needed to attain some margin of profit. In addition, defend-

ant's witnesses testified as to the low number of single-family building permits issued by defendant in the intervening years since Adreani had acquired title. We believe the record indicates that plaintiffs have established that the property remained vacant and undeveloped because of its R-2 zoning classification.

Finally, we will consider the community need for the use proposed and the care with which the community has undertaken to plan its land use development. Regarding the first of these, plaintiffs' experts, as well as defendant's real estate expert, testified that there was at best a limited need for single-family residential homes in Des Plaines. It has also been established that there has been very little activity in the building of single-family homes in the area. Plaintiffs' witnesses have also provided testimony that the proposed residences will be both marketable and affordable. Defendant presented testimony as to the leasable industrial space available within its boundaries. We note, however, that lack of community need alone, even if demonstrated, will not sustain a restriction against a proposed use. (See *Locker v. City of McHenry* (1967), 89 Ill. App. 2d 457, 463, 231 N.E.2d 685.) Regarding the second, although it is true that defendant had a comprehensive plan which was adopted in 1977, its director of planning and zoning testified that 90% of all single-family homes located in the four quadrants surrounding the subject site were already in existence in 1977, and opined that the "River's Edge" manor home development was a "good use" even though it was developed after the comprehensive plan was adopted on land designated on the plan as "open space." Further, the record reveals that both plaintiffs' land planner and defendant's director of planning and zoning had proposed plans in which the site was to be developed into areas with uses similar to those proposed by plaintiffs.

Based on our consideration of all of the above factors, in conjunction with our determination that the trial court erred in its finding that plaintiffs' proposed uses were not specific enough to enable the trial court to frame its decree in light of these uses, we find that plaintiffs have proven by clear and convincing evidence that the proposed uses were reasonable. We conclude that the trial court's finding that plaintiffs' proposed plan of residential and office/light industrial development would not be compatible and reasonable in its application to the subject site was against the manifest weight of the evidence, and we reverse the trial court on this point. In addition, we find that the trial court erred in approving 2.2 acres for commercial use and rejecting the remainder, because a court may only frame its decree upon plaintiffs' plan as a whole. (See *Sinclair Pipe Line Co. v.*

*Village of Richton Park* (1960), 19 Ill. 2d 370, 167 N.E.2d 406.) We therefore find plaintiffs' entire proposed use is both specific and reasonable.

Further, in its cross-appeal, defendant contends that on this record, the present C-2 and R-2 zoning classification should be upheld as to the whole of the subject premises. We do not agree. Affirmance of the trial court's finding as to the invalidity of defendant's R-2 classification on plaintiffs' property is warranted in light of our above application of the *La Salle* factors.

For the reasons above, we (1) affirm the trial court's finding as to the invalidity of defendant's R-2 classification as applied to the subject property, (2) reverse the trial court's finding that only the commercial portion of plaintiffs' plan was reasonable, and (3) conclude that plaintiffs' entire proposed use is both specific and reasonable.

Affirmed in part and reversed in part.

SULLIVAN and O'CONNOR, JJ., concur.