PALATINE NATIONAL BANK, as Trustee, *et al.*, Plaintiffs-Appellants, v. THE VILLAGE OF BARRINGTON, Defendant-Appellee.

Second District   No. 2—88—0164

Opinion filed December 28, 1988.

Bradtke & Zimmerman, of Mount Prospect (Erwin W. Jentsch, of counsel), for appellants.

J. William Braithwaite, of Arnstein, Gluck, Lehr & Milligan, of Barrington, and Arthur L. Klein and Paul E. Starkman, both of Arnstein, Gluck, Lehr & Milligan, of Chicago (James P. Bateman, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

The plaintiffs, as the owners and contract purchasers of a vacant 4.9-acre parcel of property located in the Village of Barrington, brought suit against the Village of Barrington seeking declaratory and injunctive relief. Following a bench trial, the trial court found that the zoning classification of the property for single-family residential uses was invalid, but found that plaintiffs' proposed use of the property for a commercial office building was unreasonable. The plaintiffs appeal.

The sole issue raised on appeal is whether the trial court's decision that plaintiffs' proposed use for the property is unreasonable and, therefore, is against the manifest weight of the evidence. We affirm the decision of the trial court.

The subject property is a 4.9-acre, irregularly shaped, vacant parcel of land located between Washington and Valencia Streets on the west side of Northwest Highway, a regional arterial highway, in the Village of Barrington. The west boundary of the subject property extends along Northwest Highway. A part of its north boundary extends along Valencia Avenue from Northwest Highway. The balance of the subject property is adjacent to the rear yards of single-family residences, except that the southeast corner of the property abuts a vacant lot.

The subject property is a low area, a collection point for storm water for the block bounded by Washington Street on the south, North Avenue on the west, Valencia Avenue on the north, and Northwest Highway on the east.

The subject property is zoned under the Village zoning ordinance as part of the R-7 single-family residential district. The Village zoning ordinance provides for various residential classifications ranging from R-1, a very low density residential classification, to R-9 and R-10, which permit multiple-family use. Each zoning classification mandates certain setback requirements which delineate how far the building must be set back from the property line.

The Village has also adopted a comprehensive plan. The plan was

most recently amended in 1986. The plan recommends that the subject property be developed with a multiple-family planned unit development with a density not to exceed 10 dwelling units per acre. The plan recognizes that the subject property has a potential for "encroachment in the neighborhood if improperly developed" and recommends that a certain percentage of the land be maintained as open space.

The plaintiffs propose to build a three-story commercial office building with floor space of approximately 96,000 square feet. Underground parking for approximately 108 cars would be provided with surface parking for approximately 241 cars also provided. The available parking exceeds the requirements of the Village ordinance.

Plaintiffs applied to the Village to rezone the property from the existing B-7 single-family classification to a B-4 business district classification. As part of their request, plaintiffs also sought a reduction of the rear setback requirement under the B-4 zoning from 100 feet to 49 feet, for a distance of 90 feet along the west property line, and the side setback requirement from 50 feet to 42 feet, for a distance of 72 feet along the south property line.

The Village denied plaintiffs' application for rezoning. Thereafter, plaintiffs filed the instant lawsuit seeking to have the Village's zoning ordinance declared unconstitutional insofar as it prohibits the development of an office building as proposed by plaintiffs and to have the Village enjoined from enforcing its ordinance against the subject property. Plaintiffs also sought the issuance of all necessary permits for the construction of the office building and sought that the Village further be enjoined from interfering with plaintiffs' use of the subject property.

The case proceeded to bench trial on January 4, 1988.

Colin Regan, a real estate developer and broker, testified on behalf of plaintiffs. He is the president of plaintiffs' real estate developer, The Regan Group, Inc. He stated that while there is vacant commercial office space available at various locations in the Village, the competing office space does not share the combination of features which make the proposed office structure unique in the Village of Barrington. The combination offered by the proposed structure is: location on a major arterial highway; availability of underground parking; new construction; high quality of construction; location in Lake County, as opposed to Cook County; designed to accommodate large uses; floor sizes in excess of 25,000 square feet; and proximity to central business district.

On cross-examination, Regan conceded that there was a substan-

tial amount of vacant office space already available in the Village. Other than an informal survey of office occupancies in the Barrington area, he did no other market or feasibility study for this project. He could not say whether the available vacant office space offered the same amenities contemplated by the plaintiffs' proposed building.

Ronald C. Flubacker, a registered professional architect, testified on behalf of plaintiffs. He was engaged by plaintiff, the Regan Group, to design an office building and improvements to be constructed on the subject property. He does not have an interest in the property. Flubacker's own residence is west and slightly north of the subject property.

Flubacker prepared a site study location map. The subject property is surrounded by single-family zoning. Across Northwest Highway are business properties, a shopping center, a two-story office building, American Can Company, and the Barrington public library. South and southwest of Washington Street are R-9 and R-10 areas which contain duplexes and apartment buildings. The apartment building has a height of three stories.

In connection with the proposal made to the Village, Flubacker constructed a model of the proposal. The proposed building is a three-story, brick-faced steel structured building. The first floor is slightly larger, allowing for a one-story roof and then the upper two floors. It is sympathetic in architectural context to the Barrington public library. The building is landscaped with a boundary trim that is elevated up the side wall of the building about three feet to further diminish the visual impact of the building. All the parking is buffered with berming or dense landscaping in order to minimize its impact to passersby and to provide a green environment to set off the image of the building. The building is 35 feet tall, which is a permitted height under the B-4 zoning ordinance.

The detention zone is to be in a landscaped park-like setting that would fill up with storm water as it was collected in the general area, and then would run dry as that water was allowed to drain into the Northwest Highway system.

As to the building's proximity to the residences nearby, Flubacker stated that on the south side, the nearest point is in excess of 200 feet, about 203 feet. On the north side, about 203 feet to 205 feet. Although Flubacker considered 200 feet to be a substantial distance between the proposed building and the residential property, they had developed a series of landscaping parameters to soften and buffer direct sight lines between the residences and the office building.

According to Flubacker, the proposed lighting plan also takes into

consideration the surrounding residential use. Light standards would be equipped with cutoffs to prevent the light from coming up and out into the surrounding neighborhood. Since it is to be used as an office building, it would mainly be used between 8 a.m. to 6 p.m., and intense evening illumination was not required, and the lighting has been downplayed. At night, low level security bollards are used to illuminate the front parking, entryway parking, and to provide rear security lighting. Only the immediate area, 20 feet or so, would be illuminated by the night lighting.

As to signs for the building, Flubacker stated that the sign proposed is a low brick wall, which is part of the landscape berm. It will have a logo on it, as well as tenant identification. There will also be a sign on the front of the building. None of the major signs will be visible from any street, other than Northwest Highway.

On cross-examination, Flubacker described the visual impact of the building onto the surrounding residential properties as negligible. He admitted, however, that the proposed landscaping at full maturity and with full summer foliage would obscure, at most, only 50% of the building's substantial mass. Moreover, Flubacker acknowledged that the residential homes on Washington Street would be about 85 feet from the parking lot of the building, and the residences on Valencia Street would be about 45 feet from the parking lot. In the event the variances for the setbacks were not granted, the building could be sited on the property differently.

Herbert Harrison, a real estate appraiser and land use consultant, testified on behalf of plaintiffs. He stated that although the subject property is surrounded primarily with residential usage, the residences face away from the subject property, and, therefore, it takes its character from Route 14 (Northwest Highway). As a result, the construction of the proposed building with the variations in the setback lines would have no impact on the use and enjoyment of the surrounding properties, nor would it affect the value of those properties.

Based upon his examination of the subject property and the surrounding area, as well as his expertise as an appraiser, he opined that the highest and best use of the subject property was development with a nonretail commercial office building, though not necessarily this building. In arriving at this determination, he considered that the subject property was segregated from the community surrounding it, that it took its orientation from the heavily traveled arterial thoroughfare (Northwest Highway) and the nature of the soils and the topography of the property. Further, there was a need for such office space, providing that the services available to subject property make the

other available property noncompetitive.

Harrison did not have an opinion as to the value of the subject property under its present zoning because he did not believe it could be marketed properly as such. However, he was of the opinion that developed as proposed by the plaintiffs, the subject property was worth $950,000.

On cross-examination, Harrison stated that he had reviewed the Village's comprehensive plan for the subject property which recommended multiple-family residences. If the soil and utility factors could be worked out, in Harrison's opinion, the property would range in value between $625,000 and $725,000.

Joseph Zgonia, a registered professional engineer, testified on behalf of plaintiffs. At plaintiffs' request, he examined the drainage characteristics of the subject property. In his opinion, there were no restrictions to the development of the subject property. The proposed development contained a drainage proposal that would ensure the positive flow of water from the upstream areas without causing any backup of waters to occur on the adjacent properties. Further, the detention system proposed far exceeds the Village's requirements and meets the more stringent requirements of the State of Illinois. Zgonia also found that an existing utility system is adequate to serve the needs of the proposed development.

Zgonia stated that he investigated the effect of the proposed development on traffic in the area. He had not made any separate traffic studies or volume-count studies because the Village's extensive roadway properties in the vicinity of the subject property made it virtually impossible to construct any type of detailed manual traffic counts adjacent to the property. He did, however, review previous traffic appraisal reports and traffic volume reports for the subject property. In his opinion, the development of the subject property as proposed by the plaintiffs' would generate traffic volumes during two critical time periods, namely, 7:30 to 8:30 a.m. and 4:30 to 5:30 p.m. The development of the type and size proposed would generate roughly 26 inbound trips during the peak street afternoon traffic hour. There would be roughly 160 outbound trips generated from the development. Those would be cars added to the street system, which would require a certain capacity to accommodate the development.

The afternoon peak traffic hour is the most critical due to the fact that it represents a time period when the largest volume of traffic would already be on the street system, coupled with the necessity to take the cars from a development and disperse them into the traffic stream without affecting the movement capacity of the roadways ad-

jacent to the overall development parcel.

In Zgonia's opinion, there would be little or no effect on the adjacent street system during the peak morning traffic hour. He also was of the opinion that there was more than an adequate capacity to accommodate the movement generated by the development. Taking into consideration the projected volume for the development of 160 cars, and the previous traffic appraisal report for the development parcel, which indicated roughly 7%, it would add about nine cars to the street system in that peak afternoon one-hour period.

On cross-examination, Zgonia reiterated that the residents of the area would not experience any levels of congestion. At the capacity of 340 cars, with a projected addition of nine cars, it would be about 35% of the total gridlock during the afternoon rush hour.

Rolf Campbell, a city planning consultant, testified on behalf of the plaintiffs. He was of the opinion that the highest and best use of the subject property was as a commercial office building since it would be part of a "corridor" of commercial uses along Northwest Highway. However, he admitted that there were no commercial uses on the same side of Northwest Highway as the subject property, except those located at a major intersection some distance from the subject property. Moreover, on cross-examination, he conceded that the recommendation contained in the Village's comprehensive plan (that the subject property be developed for multiple-family uses) was both reasonable and economically viable.

Robert Silhan, an architect and urban planner employed by the Village as its director of community development, testified on behalf of the Village. As part of his duties, Silhan and his staff provide technical assistance to the plan commission and the zoning board of appeals in preparing background material to assist them in making their recommendations to the village board of trustees with respect to zoning considerations.

The present comprehensive plan for the Village was approved in 1972. The plan suggests for the subject property a multiple-family development, using a residential planned development technique with a density no greater than 10 units per acre, but allowing for a minimum of 0.6 acres for common open space. In addition, the plan indicates that the neighborhood be protected from extreme encroachment by commercial development. Amendments to the plan in 1986 did not affect the subject property. Silhan conceded that the development recommended by the plan was not consistent with the present zoning of the area.

Silhan blamed the relatively low number of building permits is-

sued in the Village between 1976 and the present on the recessionary period between 1981 and 1985, but more importantly, on the sanitary sewer extension moratorium imposed on the Village by the Illinois Environmental Protection Agency from 1976 through 1980.

In Silhan's opinion, the highest and best use of the property would be multiple-family housing. Specifically, a townhouse development of no more than two stories, leaving what is the primary wetland area open for vacant common open space. His opinion was based in part on the traffic impact on the subject property. The development of the subject property as proposed by the plaintiffs would increase the cut-through traffic on Washington Street, particularly in the evening peak hour.

In reaching his opinion of the highest and best use, Silhan also considered the esthetics of the proposed building. Silhan felt the building itself was good, but that it was in the wrong place. He based this on the size of the site, the nature of the surrounding area, and the size of the site in relationship to the total neighborhood. In his view, it was almost an opening wedge of commercial development into what is predominantly a single-family residential area. Plaintiffs' proposed building would be much higher and more massive than anything in the surrounding neighborhood. Moreover, the proposed landscaping, even at maturity (some seven or eight years later), would not lessen the visibility of the building from the backyards of the surround community.

On cross-examination, Silhan stated that the 1959 comprehensive plan showed that the subject property was vacant. Although the comprehensive plan contemplated multiple-family housing, the Village had not changed the zoning of the subject property.

According to Silhan, while there was not another building exactly like the one proposed by the plaintiffs, there were other buildings available with certain of the qualities contained in plaintiffs' proposed building.

In Silhan's opinion, given the character of the subject property and the surrounding area, the present R-7 zoning was not suitable.

Jack Gourguechon, a professional city planner, testified on behalf of the Village as follows. He was involved in developing parts of the Village's comprehensive plan, as well as the Barrington area council of government's plan. The two plans were done simultaneously and were viewed by the Village as a dual effort, with the Village's plan within the framework of the other plan and incorporating it.

Gourguechon reiterated that as regards the subject property, the plan sets forth that it has a potential for encroachment in the neigh-

borhood if improperly developed and identifies a residential planned development as the appropriate use for the subject property. It also sets up a density of up to 10 units per acre and recommends that a certain percentage of the land be maintained in open space. He considered the recommendation of the plan a viable one based upon the site itself, the surrounding land use, the access to the site by the public road system, availability of utilities, and its proximity to the downtown section of the Village. By its comprehensive plan, the Village has sought to maintain the integrity of its residential neighborhood and has followed and exhibited a pattern of controlling commercial development along its arterial highways.

According to Gourguechon, the proposed commercial office building would have a substantial negative impact on the current trend of development which was toward a stable residential neighborhood. He also felt that plaintiffs' proposed building would introduce an incompatible commercial use into the heart of a long-established residential area. It would also result in a greater volume of nonresidential traffic and would negatively impact upon the use and enjoyment of the surrounding properties. Moreover, plaintiffs' proposed development would set an adverse precedent in the neighborhood because, if built, it probably would cause two residential homes fronting on Washington Street to also be developed commercially.

Thomas Collins, a real estate appraiser, testified on behalf of the Village. Collins was asked to provide an independent opinion of the effect of the proposed use on the character of the neighborhood, the property values of the surrounding area, and as to the highest and best use of the subject property.

In order to arrive at an opinion, Collins inspected the property and the surrounding area, the existing zoning classification, and the recommendation regarding the property contained in the comprehensive plan. In his opinion, the site, because of the location along Northwest Highway, does not lend itself to proper subdividing into single-family homesites, and therefore, such development would be the lowest end of value, approximately $250,000, or $50,000 per acre.

Collins' definition of highest and best use was "that use calculated to develop the greatest net return to the owner over a given period of time, provided that such use is an appropriate use, that it represents the best interests of the community, as well as the owner, and that no undue depreciation accrues to the adjoining property owners." In his opinion, the highest and best use of the property would be for a density of approximately 10 dwelling units per acre, developed in a residential category.

The market value of the subject property developed in accordance with its highest and best use would be in the range of $540,000 to $640,000.

In Collins' opinion, commercial use of the subject property as proposed by the plaintiffs would lead to substantial depreciation in the value of the surrounding residential homes. Factors contributing to such substantial depreciation are: the intrusion into an established residential area of a different type of use, namely, commercial; the size and layout of the building in terms of its buffering aspects; and the precedent-setting change of zoning in the nature of "spot zoning."

On cross-examination, Collins stated that he had made an independent determination of need for residential use but did not determine the need for an office building.

At the conclusion of the proceedings, the trial court noted that the zoning classification of R-7 was unreasonable, arbitrary, and unrelated to the public health, safety, comfort, morality, or welfare, and declared it void and unconstitutional. However, after considering the testimony of the witnesses, the nature of the surrounding area and the Village's comprehensive plan, the trial court found the proposed use unreasonable, stating as follows:

> "I have considered the nature of the property on the east side of the Northwest Highway, and the fact it has been developed with large buffer areas. Those structures which front on Northwest Highway are substantially smaller in volume and bulk than the subject property.
>
> It is clear to me that the proposal presented would unduly and improperly thrust, as one of the witnesses testified earlier in the case, an opening wedge into the heart of the residential area.
>
> The building as proposed, particularly in light of the setback variance, is inappropriate, and I will therefore deny the petition of the plaintiffs to declare that they are entitled to build that building on the site."

This appeal followed.

■ At the outset, we observe that the rules by which we review zoning cases such as the one before us are well settled and are not disputed by the parties here. In challenging a zoning ordinance, a plaintiff must establish by clear and convincing evidence that it is arbitrary and unreasonable as applied to his property, without relationship to the public health, safety, or welfare, and further, that the proposed use of the property is reasonable. (*Gunderson v. Village of Hinsdale* (1987), 156 Ill. App. 3d 92, 101.) The trial court here deter-

mined that the zoning ordinance as applied to the subject property was unconstitutional and void. Thus, the only issue this court needs to address is whether the trial court's finding that the proposed use of the subject property was unreasonable is against the manifest weight of the evidence.

■ The factors that the court will consider in passing on the validity of a zoning ordinance and the reasonableness of a proposed use have been repeated time and time again. (See *Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 381 (and the cases cited therein).) They are: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public; (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purposes; and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47.

■ In the case before us, each side produced its own series of expert witnesses to support its position resulting, not surprisingly in quite a bit of contradictory testimony. Confronting a similar dilemma, our supreme court has stated:

"Difference of opinion does not render plaintiff's evidence unbelievable or require a finding that the reasonableness of the ordinance is debatable.

＊＊＊

＊＊＊ There is naturally a conflict of testimony in cases of this nature and the credibility of witnesses is of great importance. The triers of fact are in a superior position to that of the reviewing court in such a situation. When testimony is contradictory in a trial without a jury the weight to be accorded testimony is a matter to be determined by the trial court and its findings will not be disturbed unless manifestly against the weight of the evidence." *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 47-48.

■ Although no standard is determinative, of paramount importance is whether the restrictions imposed on the property are in conformity with the uses and zoning of nearby property. (*Amalgamated Trust & Savings Bank*, 82 Ill. App. 3d at 381.) While plaintiffs' witnesses testified that the impact of the proposed building would be

negligible, the Village's witnesses testified and the trial court found that the plaintiffs' proposed office building would introduce an incompatible commercial use into the heart of the surrounding residential area. Although there was conflicting testimony as to the factors that contributed to finding that the proposed development was unreasonable, there is ample support in the record for the trial court's finding on this point.

■ The plaintiffs also argue that the subject property takes its character from the commercial uses found in the opposite (east) side of Northwest Highway, because according to plaintiffs' witness, Harrison, it fronts on the highway, and some of the surrounding residences face away from the subject property. However, Harrison conceded that the commercial uses located across Northwest Highway were either set in much larger landscaped open areas than the proposed commercial building or included much smaller and less intensive commercial uses, such as a one-story bank. The trial court, therefore, was correct in distinguishing these uses from plaintiffs' proposed use and in holding that the subject property takes its character from the residential neighborhood which surrounds it on both sides.

■ Although plaintiffs' proposed development offered a combination of amenities not all of which were available in other commercial developments, there was ample testimony that vacant office space with some, if not all, of these same amenities existed in the Village. Although plaintiffs attempted to justify the proposed development on the subject property on the basis of "need," no special studies were commissioned by plaintiffs to establish this need, and the amount of vacant commercial office space belies the existence of such "need."

■ Both sides presented testimony as to the effect of the development on area traffic. There is no dispute that the traffic would increase. The question is whether the increase would adversely affect the surrounding residential property. Given the conflicting testimony on that point, we cannot use this point as a basis for overturning the trial court's decision.

■ Plaintiffs rely on the fact that the subject property is not marketable as zoned whereas it has a value of $950,000, if developed commercially, according to their plan. Although Thomas Collins' testified for the Village that the property was worth $250,000 as presently zoned, he agreed with plaintiffs that the property probably was not marketable as presently zoned. However, Collins also testified that if the subject property were developed as multiple-family housing, it would range in value from $540,000 to $640,000. Plaintiffs' own witness, Harrison, testified that if developed with a multiple-family resi-

dential use consistent with the Village's comprehensive plan, the subject property would have a value of $625,000 to $725,000. The mere difference between the value of the property as zoned and as developed under plaintiffs' proposal does not, in and of itself, show that the plaintiffs' proposed development is reasonable. *Du Page Trust Co. v. County of Du Page* (1975), 31 Ill. App. 3d 993, 999-1000.

■ Plaintiffs further rely on the fact that the subject property has been vacant since 1958. The length of time property has been vacant must be considered in the context of all land development in the vicinity. (*Cech Builders, Inc. v. Village of Westmont* (1983), 118 Ill. App. 3d 828, 832.) There was evidence in the record that much of the surrounding area was also vacant in 1958. Further, there was testimony as to a sewer extension moratorium imposed by the Environmental Protection Agency which occurred in the early 1980's, as well as the effect of the economic recession experienced in 1980, both of which affect building in the area. Therefore, we are not prepared to conclude, as plaintiffs suggest, that the property would have no value if they are not allowed to proceed with their proposed building.

■ We disagree with plaintiffs' contention that the Village's comprehensive plan is irrelevant to the question of whether the proposed development is reasonable. One of the more important factors the court considers in determining the reasonableness of a proposed use is whether the community has given care and consideration to the use and development of the land. (*Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 378.) The existence of a comprehensive plan indicates the community has given careful consideration to the orderly utilization of the property within its borders. (*First National Bank v. Village of Vernon Hills* (1977), 55 Ill. App. 3d 985, 990.) Further, this court has held that a comprehensive plan should be considered in determining the reasonableness of a proposed use. (*Wilson v. County of McHenry* (1981), 92 Ill. App. 3d 997.) Also relevant evidence is the proposal of an intervening zoning classification between the existing zoning classification and the proposed use in deciding the appropriate use of the subject property. *Gunderson v. Village of Hinsdale* (1987), 156 Ill. App. 3d 92, 102.

■ Plaintiffs argue that their proposed use is reasonable because it is "consistent" with an alleged practice on the part of the Village of allowing high-rise buildings to encroach on residential neighborhoods. As examples, they refer to several buildings they assert are in close proximity of residential districts. However, in the examples used, one was a residential apartment building, rather than commercial office space. The other was a bank which was constructed

on property which historically had been used for business purposes. Thus, there was no evidence that any of the buildings to which plaintiffs alluded represented an "opening wedge" of intensive commercial use into the midst of a residential neighborhood, as plaintiffs' building was to have been, nor does it establish such a practice on the part of the Village.

Based on the above discussion and the record in this case, we are of the opinion that the trial court's decision that plaintiffs' proposed development was an unreasonable use of the property is not against the manifest weight of the evidence.

The judgment of the circuit court is affirmed.

Affirmed.

DUNN and McLAREN, JJ., concur.