RICHARD A. STALZER *et al.*, Plaintiffs-Appellees, *v.* VILLAGE OF MATTESON, Defendant-Appellant.

(No. 56786;

First District (1st Division)—October 1, 1973.

Samuel J. Sherman, of Chicago, for appellant.

McCarthy, Scheurich, Duffy & McCarthy, of Chicago, (John M. Duffy, of counsel,) for appellees.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

Richard A. Stalzer and Lawrence A. Stocking, Jr. (plaintiffs) brought an action for declaratory judgment and other relief against Village of Matteson, a municipal corporation (defendant.) Plaintiffs sought to invalidate a zoning ordinance of defendant as applicable to real estate owned by them. The trial court granted the relief prayed, found the ordinance invalid in its application to plaintiffs' property and directed issuance of necessary permits to plaintiffs for the use of the property which they sought. Defendant appeals.

In this court, defendant contends that a property owner attacking a zoning ordinance has the burden of overcoming the presumption of validity of the ordinance by clear and convincing evidence. Defendant urges that plaintiffs' purchase of the subject property in the face of existing and established single family residential zoning is a factor to be considered in determination of whether such zoning is confiscatory or discriminatory; plaintiffs have thereby placed themselves in a less favorable position; since plaintiffs purchased with knowledge of the existing zoning, it is reasonable to assume that they paid a price commensurate with that use and plaintiffs cannot now claim that the ordinance is confiscatory; if there be hardship to plaintiffs, they deserve no relief in view of their previous knowledge of the zoning and this is especially true when the apartment development proposed by plaintiffs would violate the dependence of adjoining homeowners on the continuance of the zoning and there is evidence that the proposed use would damage the value of their homes.

Defendant also urges that the proposed use would bring more people and automobiles into the area with increased traffic congestion, danger and noise; there are ample apartment developments and land zoned for apartments in Matteson and where there is a legitimate difference of opinion with factors which point in each direction, upon which reasonable men might differ, with evidence of loss in market value likely to result to nearby residences and use of the subject property for residential purposes is feasible, the court should not disturb the legislative decision of the municipality as to zoning.

Plaintiffs urge that the presumption of validity of the ordinance applies only to the existing zoning classification; the finding of the trial court that the R-1 classification is void, does not cause the zoning to revert to its prior R-2 classification but the effect of the judgment is to leave the property unzoned and the court must then consider whether the proposed use is reasonable. Plaintiffs contend that it is significant that none of the experts who testified consider the present R-1 zoning of the subject property to be its highest and best use; the R-1 classification is un-

reasonable because it prohibits construction of apartments on the subject property; the railroad north of the property is at grade level and it is adapted to services and encourages industries on its land immediately to the north of the subject property which is a strong factor in favor of the use proposed by plaintiffs and the existence of a difference of opinion among the witnesses does not necessarily mean that the court must find that reasonableness of the ordinance is debatable but it is for the court to determine from all the evidence whether the differences of opinion are reasonable and justifiable. Plaintiffs further urge that they did not purchase the property in the face of R-1 zoning which was adopted after their purchase; the findings of the trial court should not be disturbed unless opposite conclusions are clearly evident; the zoning classification must bear a substantial relation to the public welfare and there is no evidence in the record that the subject property could be profitably developed under its present zoning.

The subject property, rectangular in shape, is entirely within the defendant Village, east of Main Street. The north line of the property runs slightly over 1330 feet east from Main Street to the eastern line of the Village limits. The south boundary runs parallel with the north, approximately the same distance. The west line is slightly over 340 feet and fronts on the east side of Main Street. The east line is also some 340 feet and is part of the east Village boundary.

The entire property consists of slightly over ten acres. It has not been subdivided and it is vacant except for a residence some 70 years old fronting on Main Street in the western portion of the tract. Immediately to the west of the property there is an irregularly shaped area zoned for industrial use; I-1 under defendant's ordinance. The same zoning exists in the strip of property immediately to the north. On the east boundary of the subject property there is a wide surface drainage ditch located within the Village of Park Forest. Immediately to the south of the subject property there are a series of single family homes zoned R-2. These homes front upon both the north and south sides of 218th Street. The subject property is thus located to the rear of those on the north side.

Commencing about 1943, the subject property was zoned for industrial uses under the classification I-1. The defendant's ordinances provide that this classification is intended for heavy commercial and light manufacturing and industrial uses under controls which would minimize adverse effects on property in nearby residential and business districts. The property was devoted to farming uses from 1943 to approximately 1959. On August 7, 1961, the property was zoned R-2 (Ordinance No. 538.) About in May of 1969, plaintiffs purchased the property. At or about that time, they filed an application before the Matteson Plain Commission for

permission to construct an apartment building project as a planned development on the subject property which would in effect change the zoning classification to R-4. In May of 1969, this request was denied and on July 7, 1969 the defendant's Board of Trustees concurred in this denial.

In June of 1969, defendant adopted Ordinance No. 704 which operated to rezone all new and unplatted subdivisions, including the subject property, to an R-1 classification. Plaintiffs' proceedings for declaratory judgment were filed October 21, 1969. Thereafter, on March 2, 1970, defendant adopted a comprehensive ordinance which confirmed the zoning classification of the property as R-1 (Ordinance No. 724.) In the defendant's ordinances, R-1 permits single family detached dwellings on lots not less than 70 feet wide of an area not less than 8400 square feet. R-2 zoning permits single family residences on lots at least 50 feet wide and at least 7500 square feet in area. R-4 permits multiple family apartment house dwellings not to exceed seven stories or 70 feet in height, whichever is lower.

We will next note the present zoning and actual land uses in the vicinity of the subject property. Immediately to the north of the property, extending along its entire north boundary, is a strip of land which is vacant except for an automobile body shop on the western portion thereof. That entire strip is zoned for industrial uses in the I-1 category. Its north to south dimension is approximately 160 feet. It is owned by the Elgin, Joliet & Eastern Railroad and used as part of its maintenance and repair yard. The railroad stands ready to service any industry which might be developed on this land. In the southern portion of this area, adjoining the subject property, are the main tracks of the E. J. & E. Railroad running east and west. There are ten tracks in the rail yards in this area. These railroad tracks are on ground level, being neither raised upon a viaduct nor depressed. Also in the same immediate area are the so-called interchange tracks of the Illinois Central Railroad. This interchange is used for changing of cars between the two railroads and it runs up and joins the main line of the Illinois Central Railroad some 200 feet to the west.

Immediately to the north of the railroad tracks is a large tract of land zoned I-1 and I-2. Actual land uses in this area are a concrete Ready-Mix plant and a lumber and coal company serviced by the E. J. & E. Railroad and also another manufacturing plant. The I-2 use is for heavy industrial purposes. Any additional industrial uses which might be established in this area could be directly serviced by the railroad. The evidence shows that the railroad would encourage such development which would be for its benefit.

The property to the east of the subject property is within Park Forest. Proceeding in an easterly direction, the first 250 feet of land is devoted to a surface drainage ditch. This land is used as a park and is not adaptable for building purposes. Still further to the east there is a large tract of land, also in Park Forest, zoned for single family residence use. In this subdivision the R-1 zoning abuts upon the southern border of the railroad tracks. The railroad property there is used exclusively as a right-of-way. The railroad does not service industry in the vicinity of this subdivision.

Directly to the south of the subject property is a residential subdivision under R-2 zoning. It is bisected by 218th Street, which runs east and west. The western boundary of this street is Main Street, which runs north and south. There are 22 homes on each side of 218th Street in this area which is roughly the same size and shape as the subject property. All of the homes front upon 218th Street so that the rear portions of the homes in the northern half of the subdivision abut upon the southern boundary line of the subject property.

Immediately next to the south of this subdivision there is another vacant strip of land of approximately the same shape and size. It is zoned R-1 but is mostly undeveloped. The southern boundary of this area is the southern limit of Matteson. Next, to the south is a strip of land zoned R-4 which is used for public utility high tension electric lines.

The west side of Main Street, which street forms the western boundary of the subject property, is all zoned I-1 for lighter industrial uses. It contains, in the northern portion thereof, the general offices of a large corporation. Immediately to the west is the right-of-way of the Illinois Central Railroad running in a northeasterly direction. These tracks are elevated and are the source of the interchange track connecting to the E. J. & E. Railroad property. Southwest of the subject property there is a row of old residences and farther to the south, also in the I-1 zoning area, there is a machine shop.

We will next state a brief summary of the testimony. William Lawrence, a duly qualified planning and zoning expert, a witness for plaintiffs, testified that the highest and best use of the subject property from a planning point of view was for multiple family residential use as proposed by plaintiffs. In his opinion, the building of this project would have no adverse effect upon the single family uses to the south but would create a screen against the unsightly railroad conditions that exist to the north. He expressed the opinion that this project would have no adverse effect upon the public health, welfare or morals of the community.

William A. McCann, a duly qualified broker and appraiser, testified

for plaintiffs that he defined the highest and best use as that which would produce the greatest net return to the owner providing that it would be in keeping with the trends and needs of the community as a whole and would not unduly depreciate the surrounding property. He expressed the opinion that the highest and best use of the subject property would be the proposed planned development advocated by plaintiffs which would be in accordance with the R-4 residential classification of the defendant. He expressed the opinion that this proposed use would not have an adverse effect upon the surrounding residential property but that it would provide a buffer zone between this property and the railroad-industrial uses. As regards the valuation of the subject property, under existing R-1 zoning, the fair market value would be $10,000 per acre or approximately $100,000. If used according to the R-4 standards of defendant, the property would be worth $20,000 per acre or approximately $200,000. This witness also expressed the opinion that the proposed project would not have any adverse effect upon the public health, welfare or morals of the community.

Plaintiffs also called another qualified real estate broker, appraiser and consultant, John E. Shanahan. After a study of the subject property, the adjacent land uses and zoning, and the development proposed by plaintiffs, he expressed the opinion that the highest and best use of the subject property was for multiple family improvement. In his opinion, the present R-1 zoning does not accord with the highest and best use of the property. The use proposed by plaintiffs agreed with his opinion of the highest and best use. He pointed out that there would be screening by trees in the proposed use against the industrially zoned property to the north and also that the property in question was accessible to Main Street and within a few minutes walk from the Illinois Central Railroad station which provides fast transportation to downtown Chicago. This witness also expressed the opinion that the use proposed by plaintiffs would not have any adverse effect upon adjacent single family properties. His reason was that this proposed development would provide a transition from single family residential homes to the south of the subject property and the industrial property to the north.

Defendant called James J. Curtis, Jr., a duly qualified real estate appraiser and consultant. In his opinion, from the economic point of view, the highest and best use of the subject property would be for single family homes under the R-2 zoning. The fair cash market value of the entire subject site under this use would be approximately $7500 an acre or approximately $75,000. Under R-1 zoning, the value of the property would be $6500 an acre or approximately $65,000. In his opinion, the development proposed by plaintiffs would have an adverse effect upon

the value of the homes immediately to the south on 218th Street because of increased density of use. He described this as an effect which would vary with the market as regards supply and demand. The loss in value could be from three to five percent of the present market value of these homes which presently range from $22,000 to $27,500. In his opinion, the proposed development would not have any effect upon the value of homes on the south side of 218th Street other than causing crowding in the schools or possible traffic situations which is very small and very difficult to compute. The witness stated specifically that the highest and best use of the property would be under the R-2 zoning rather than under its present zoning of R-1.

Defendant called Rolf C. Campbell, a qualified city planning and zoning consultant. He expressed the opinion that the subject property would be suitable for single family residential use. In his opinion, the trend of development of the area in the immediate vicinity of the subject site was toward single family residences. He also testified that development of the site for multiple family uses would create traffic congestion as one of the principal problems. The building of the dwelling units in the proposed project would, in his opinion, create traffic problems in comparison to the situation in the event that the site were to be retained for single family residential use. He also expressed the opinion that from the planning point of view, the highest and best use of the subject site would be for single family residences under the R-2 zoning classification despite the fact that the applicable ordinances have rezoned the property to R-1. He expressly stated that he did not agree with the present zoning but that he would prefer R-2 over R-1.

As regards the issue of traffic congestion, plaintiffs called Paul C. Box. He is a qualified traffic engineer, educated and experienced in that field, who made a study of traffic conditions in the vicinity during August of 1970. This witness not only checked the entire area from a traffic point of view, but conducted traffic counts including a complete count of all turning vehicles as well as bicycles and pedestrian traffic in portions of the area. He also studied the site plan in connection with the project advocated by plaintiffs. He then made calculations concerning the projected traffic generation for the site in question upon the basis of R-1, R-2 and apartment development. In the opinion of this witness, these projections show that no problem would be created by the traffic which would be generated from development of the site as advocated by plaintiffs; assuming proper design and location of driveways.

Henry Embree, a licensed real estate broker testified for defendant. By coincidence, he lives in one of the homes south of the subject property on 218th Street. In his opinion, completion of the project contem-

plated by plaintiffs would cause the value of the single family homes, located on 218th Street south of the subject property, to drop at least 15%. The homes located on the north side of 218th Street would probably suffer more because they abut the subject property. He also expressed the opinion that development of the subject property for an apartment use would generate additional traffic. He would view any improvement to the north of his home adversely although he knew when he bought the home that the property immediately to the north was zoned for industrial uses.

Bernard Fried, witness for defendant, is a real estate broker doing business in the area. His office is in the Village of Park Forest. He lives in Park Forest in a home northeast of the subject property. He expressed the opinion that if the subject property were improved with single family homes they could be sold very quickly. In his opinion, the industrial zoning of the abutting property to the north would not have any influence upon the marketability of these homes. This witness guessed that three or four trains would pass over the railroad tracks in question during every 24 hour period. However, a qualified employee of the Elgin, Joliet & Eastern Railroad testified that eight to ten trains are scheduled to pass on the tracks during every 24 hour period and about 13 to 17 trains are moved past the property each day including switching activities.

Defendant called Herman Tieri, a licensed broker and realtor, also qualified as an appraiser. He expressed the opinion that an apartment development upon the subject property would reduce the value of the homes on the north side of 218th Street by about 10%. Also, the homes on the south side of that street would suffer but not as much as those contiguous to the property. He estimated their loss in value at about 5%. He also expressed the opinion that about four trains a day pass over the railroad tracks to the north. In his experience, light industrial property located near single family uses has an adverse effect upon the sale and value of single family homes.

■■ Defendant also called Thomas McKeown who lives on 218th Street in a single family home. The parties stipulated that this witness opposed the apartment use sought by plaintiffs. We should comment here, "* * * that the use of property cannot be restricted or limited merely because neighboring property owners so desire, or because they think it might protect the value of their residence." *Regner v. County of McHenry,* 9 Ill.2d 577, 582, 138 N.E.2d 545 cited in *Oak Park National Bank v. City of Chicago,* 10 Ill.App.3d 258, 267, 294 N.E.2d 42.

The record shows in detail the apartment use proposed by plaintiffs. There would be a total of five buildings of masonry construction with

three stories, serviced by elevators. Construction would conform to defendant's building code and to the requirements under its R-4 zoning. Each building would have 41 apartment units with a total of about 205 apartments consisting of 82 one bedroom units and 122 two bedroom units. The buildings would be well distributed upon the site as reflected by a plan introduced in evidence. The buildings themselves would cover a total of 1.76 acres with an open area of 8.45 acres out of which 4.24 acres would be landscaped with trees and grass. Planning data indicates total site acreage of 10.27 acres. Parking spaces for 408 cars would be provided in proximity to the buildings.

A swimming pool and tennis courts would be included for recreation. Trees and landscaping would separate the project from the railroad property to the north. Similarly there would be a separation or screen between the southern boundary of the proposed project and the backyards of the homes to the south. No parking facilities would be provided along the southern boundary of the project. The buildings would be spaced so that there would be 140 feet between the northern boundary of the backyards to the south and the southern edge of one of the buildings. This would be the closest building to the residential area to the south and it is arranged so that its most narrow edge would point to the south.

It should also be noted that plaintiffs have exhausted their administrative remedies as above shown. The Plan Commission of defendant Village denied plaintiffs' application because of anticipated traffic and parking problems; the necessity to upgrade storm and sanitary sewer systems serving the subject site and because the comprehensive zoning plan of defendant did not contemplate multifamily residential use in the area. However, the parties have stipulated that available sanitary sewers, storm sewers and water facilities are adequate to service the proposed use of the property. The evidence also shows that the subject property is within walking distance of the Illinois Central commuter trains running to downtown Chicago.

Analysis of this evidence should proceed under basic legal guidelines which are clear and long established by many decisions of the reviewing courts of Illinois. The decision of our Supreme Court in the constantly cited case of *LaSalle National Bank v. County of Cook,* 12 Ill.2d 40, 145 N.E.2d 65, sets forth the required principles. They may be summarized as follows:

■■ 1. It is primarily the province of the municipality to decide zoning matters. Courts will not interfere with municipal decisions in this field unless they are arbitrary or capricious or are not related to public health, safety and welfare.

■■ 2. Therefore, zoning ordinances are presumptively valid and the burden rests upon the plaintiff in any case to overcome this presumption by clear and convincing evidence.

■■ 3. If evidence is produced to the effect that the restrictions bear no substantial relation to public health, safety, morals, comfort and general welfare, the ordinance will be declared void as regards its application to the property of the plaintiff.

4. Zoning cases are *sui generis* so that the validity of each such ordinance must be determined on its own facts and circumstances.

In addition, the Supreme Court set forth six pertinent factors which must be considered to determine the validity of any zoning ordinance. These elements have been stated repeatedly in many subsequent cases. See *LaSalle National Bank v. County of Cook*, 4 Ill.App.3d 266, 271, 280 N.E.2d 739.

■■ As regards the highest and best use of the subject property, the trial court found in the judgment order appealed from that it was according to the R-4 standards of defendant's zoning ordinance. The court also found that no expert witness for either side testified that the present R-1 zoning of the property represents its highest and best use. These findings are amply supported by clear and convincing evidence. This case is anomalous in that there is agreement among all the experts that the present zoning of the property is not in accordance with its highest and best use. On the contrary, there is clear and convincing evidence that the highest and best use of the property is in accordance with the R-4 zoning classification. Actually, here, the primary issue before the court is the validity of the present R-1 zoning and its impact upon the subject property. We cannot modify or change the zoning status or classification of property. We can only determine the validity of the ordinance as regards the subject property and also the reasonableness of the proposed use.

Considering the evidence here in the light of the six factors expressed by the Supreme Court (see 12 Ill.2d at 46, 47) the existing zoning and uses of nearby property are at least partly incompatible with the R-1 zoning. The light industrial uses to the immediate north of the subject property would seem to make the R-1 classification incongruous.

■■ As regards the extent to which the value of the subject property is affected by the R-1 zoning, the trial court found that the fair market value of the property as thus zoned is from $65,000 to $100,000. But, as used in the project sought by plaintiffs in accordance with R-4 standards, the value would be from $200,000 to $215,000. This finding is amply supported by the evidence.

■■ We must next consider whether this reduction in the value of the

property owned by plaintiffs will promote the health, safety, morals or general welfare of the public. This is closely related to the next factor which is relative gain to the public as compared to the financial hardship which present zoning imposes upon plaintiffs. No gain of any kind to the general public appears from the R-1 zoning. It would appear that the public interest would be better served by creation of an apartment project which would make more than 200 apartments available for family use at reasonable rentals. In addition, it would seem that defendant would gain an advantage from having more available housing and from having the value of the property increased for tax purposes.

■■ The next two factors involve suitability of the subject property for its present zoning and the length of time it has been vacant as zoned. The evidence shows that the property has been vacant for years without development under the R-2 and the R-1 classifications. The former owner of the property who had sold it to plaintiffs first acquired it in 1943. It was then devoted to farming use. After the zoning change to R-2, he attempted to sell the property and listed it for sale with a broker. Also, he put a large sign on the property facing the highway. Throughout the years he did not receive any reasonable offer for the use of the property for single family residences. This is cogent evidence of the unsuitability of the present zoning.

It follows from the above analysis that this record discloses a situation in which the zoning imposes a most substantial reduction in the value of the property owned by plaintiffs without any corresponding benefit or advantage to the public welfare. *LaSalle National Bank v. County of Cook*, 12 Ill.2d 40, 48, 145 N.E.2d 65; *LaSalle National Bank v. Village of Harwood Heights*, 2 Ill.App.3d 1040, 1047, 1048, 278 N.E.2d 114.

■■ Defendant urges strongly that we have here a difference of opinion between the experts or a fairly debatable question; or, alternatively, factors which point in each direction regarding the validity of the zoning. It is true that many, many decided cases have held that in such a situation the presumption of validity of the zoning ordinance will prevail. However, in the case at bar, we do not have that type of situation but, quite to the contrary, we have a case in which the evidence in support of plaintiffs' position is clear and convincing precisely as found by the trial court in the judgment order. The present R-1 zoning is totally unsupported by the evidence.

Reasoning then from the premise of established invalidity of the existing ordinance, the next problem is whether the specific use advocated by plaintiffs is demonstrated by the record before us to be compatible and reasonable in its application to the subject property. (*Sinclair Pipe Line v. Village of Richton Park*, 19 Ill.2d 370, 167 N.E.2d 406; *Fiore v.*

*City of Highland Park,* 76 Ill.App.2d 62, 221 N.E.2d 323.) It is established that plaintiffs were not obliged to carry the matter further and prove the invalidity or unreasonableness of any other alternative zoning classification. (*First National Bank of Skokie v. Village of Morton Grove,* 12 Ill.App.3d 589, 595, 596, 299 N.E.2d 570, 575, 576.) The trial court found that there were no unusual traffic problems or hazards which would be caused by the proposed development. In this regard, the expert testimony adduced by plaintiffs regarding lack of traffic problems from the proposed improvement far outweighs the general and unsupported opinion evidence of two of defendant's witnesses; one of whom lacked education in and both of whom lacked experience and expertise, in traffic matters. Neither of these witnesses made an actual traffic survey of the surrounding area.

■■ As regards adverse effect of the proposed use upon the area, there was a difference of opinion between the experts. Upon careful review of all the evidence, we have concluded that the trial court was correct in finding that the proposed project would "not adversely affect the market value of any of the surrounding property" and would "not adversely affect the public health, welfare and morals of the community." These conclusions are well supported by proof that by screening off the industrial uses to the north, and thus providing a stable buffer between these uses and the residential uses to the south of the subject property, the proposed project would not detract from the value of residential housing in the area. It is more practical and reasonable to have an apartment project as a buffer between the industrial and the single family uses to provide for a well regulated and gradual change in the area zoning from I-1 to R-4, then to R-2 and finally R-1. The proposed project is carefully thought out and, therefore, well calculated to provide such a desirable situation.

In our opinion, the findings made and the result reached by the trial court are fully supported by clear and convincing evidence.

Judgment affirmed.

EGAN and HALLETT, JJ., concur.