GLENVIEW STATE BANK, as Trustee, *et al.*, Plaintiffs-Appellants, v. THE VILLAGE OF DEERFIELD, Defendant-Appellee.

Second District   No. 2—90—0756

Opinion filed May 16, 1991.

Brian M. Fornek, of Schain, Firsel & Burney, Ltd., of Chicago (Robert C. Kenny, of counsel), for appellants.

Siegel & Warnock, of Chicago (Jack M. Siegel, of counsel), for appellee.

PRESIDING JUSTICE REINHARD delivered the opinion of the court:

In March 1988, plaintiffs, Glenview State Bank, as trustee, and Howard Savings and Loan Association, filed an application with defendant, the Village of Deerfield (Village), to rezone the subject property and allow a special use and variation. On February 23, 1989, the Village plan commission recommended denial of plaintiffs' application. On April 3, 1989, the Village board of trustees voted to accept the recommendation of denial.

On May 24, 1989, plaintiffs filed a complaint for declaratory judgment and injunctive relief seeking to have defendant's zoning ordinance declared unreasonable. Plaintiffs also sought to have the court declare that the proposed use was reasonable. Following a bench trial, the trial court entered judgment in favor of defendant and found that the R-1 classification (residential use) was reasonable and that the proposed use was unreasonable. Plaintiffs appealed following the denial of their motion to reconsider.

The subject property is located in an area commonly known as Hovland in Deerfield. Hovland is a single-family residential area which is approximately four blocks long by four blocks wide. The streets bordering Hovland are Hackberry on the north, Willow on the east, Lake-Cook Road on the south and Wilmont Road on the west. Within this area, there has never been a nonresidential use except for a church, a school and a park. The subject property is located on the southwest corner of this area at the intersection of Lake-Cook Road and Wilmont Road. At this intersection, Lake-Cook Road has seven lanes of traffic, four westbound and three eastbound, and Wilmont Road has four lanes. This area is known as the Lake-Cook corridor. The south side of Lake-Cook Road is zoned for commercial use, and there are several commercial buildings on that side of Lake-Cook Road including, from west to east, the Arbor Lake Center, the Baxter Corporation, the Lake-Cook Road Office Center and the Deerfield Business Center. The west side of Wilmont Road also has commercial buildings including the Tollway North, Walgreen and United Conveyor buildings. Several of these buildings are more than one story tall and can be seen from the residences in the Hovland community. Approximately 30,000 to 40,000 cars per day pass the location on Lake-Cook Road and 10,000 to 20,000 on Wilmont Road.

The subject property is approximately four acres and zoned R-1 for single-family residential use. For areas zoned R-1, the Deerfield Zoning Ordinance, which was admitted into evidence, requires a minimum lot size of 20,000 square feet, a maximum structure height of 35 feet and a minimum lot width of 100 feet.

The proposed use is a combination of a family restaurant, a savings and loan with a drive-up facility and an office building. The restaurant will be about 7,500 square feet and 14.5 feet high. The other building will be three stories, which will be 35 feet high. The proposed use includes four drive-up lanes under a canopy. The three-story building is set 121 feet from the easternmost property line. The measurement from the rear wall of the restaurant to the rear property line is 250 feet. One of the two buildings is 270 feet from a home, and the other building is 84 feet from a residence. A berm of about two feet will extend down the property line and will be planted with evergreens which would be approximately 10 feet tall. The proposed use will also include a loading berth and trash containers. The entrance to the site would be on the east end of the subject property. The entrance is designed for "right-turn-in-right-turn-out" and no left turns from 4 p.m. to 6 p.m. Although the proposed use provides for only 287 parking spaces, the Village ordinance under this plan requires 296 spaces.

John Prodromos testified that when he purchased the property, he was aware that the zoning classification was residential. He also stated that, when he purchased the property in 1985, there were two houses on the land. One house was moved to a neighboring lot and the other was razed. The subject property is now vacant land.

Joseph Abel, an expert in the field of land use and planning, testified for plaintiffs. Abel opined that the subject property is not appropriate for single-family development, especially considering the traffic at the Lake-Cook/Wilmont intersection. He based that opinion in part on the fact that over the last 10 years only 2.5% of the total property fronting Lake-Cook Road from Saunders to Waukegan Roads was developed for single-family use, while approximately 25% of the frontage had been developed for commercial or office use. Abel stated that the trend of development in the corridor and along Wilmont Road is for commercial and office use. Abel's opinion was that the most appropriate use for the subject property is not R-1 single-family development and that the R-1 zoning classification was totally inappropriate. After describing the proposed use for the subject property, Abel opined that the proposed use is totally compatible with the uses surrounding the subject property and will not have any adverse effect on

the surrounding residential area to the north and to the east. Abel also stated that the proposed use would be an excellent transition from the commercial area to the residential area and would comply with the highest and best use of the subject property.

On cross-examination, Abel admitted that, when he worked as a consultant for defendant, he prepared a comprehensive plan which designated the subject property for single-family development. Abel agreed that the area has maintained itself as a residential area and that the trend in the area would be "in-fill" residential development, specifically single-family development. Abel also agreed that, under the proposed use, people could be coming in as early as 6 a.m. and as late as 10 p.m. and parking within 10 feet of the neighbor's backyard.

Terrence O'Brien, who was recognized as an expert in the field of real estate appraisal and evaluation, testified for plaintiffs. After describing the proposed use and defining highest and best use, O'Brien opined that the highest and best use of the subject property would be a business or commercial development. In O'Brien's opinion, the value of the subject property with the proposed use is $1,400,000. Under its existing R-1 zoning, the value would be $360,000, and even under the Planned Residential Development (Planned Residential Development) under R-1 zoning, the value would only be $700,000. Further, O'Brien's opinion was that there definitely was a need for restaurants and office space in the area. After describing a study which he conducted showing that an office building within 50 feet of residences had no effect on the residences' level of appreciation, O'Brien stated that the proposed development is harmonious and compatible with other land uses in the area. On cross-examination, O'Brien admitted that the Budah office building only three-fourths of a mile away from the subject property is unoccupied. O'Brien also admitted that the trend in the area is for single-family development. O'Brien also thought that there was a reasonable probability of rezoning the area for more intense single-family use.

Joseph Zgonina, who was recognized as an expert in the field of civil and traffic engineering, characterized Wilmont Road as a "neighborhood-type collector arterial" because it is a short, narrow road with a posted speed limit of 30 miles per hour; however, it does carry a large volume of traffic. Zgonina characterized Lake-Cook Road as a "high-type regional arterial" road because it is a long, multilane road running from Lake Michigan to Kane County and carrying a large volume of traffic with a posted speed limit of 45 miles per hour. The peak periods of traffic are 7:30 a.m. to 8:30 a.m. and 4:30 p.m. to 4:45 p.m. As to the proposed use, Zgonina believed that it would

cause 80 inbound movements into and 35 outbound movements out of the subject property during the critical morning-peak traffic. During the critical afternoon-peak traffic, the proposed use would cause 150 inbound movements and 185 outbound movements. Zgonina stated that the projected volume of traffic from the proposed use would not significantly increase existing traffic volume or substantially impact on Lake-Cook Road or Wilmont Road traffic. Zgonina opined that the proposed use would cause no safety problems because there would be two independent-lane uses and no cross-over traffic and that traffic access to and from the subject property with the proposed use would be safe, efficient and convenient. Zgonina also testified that the internal circulation of traffic in the proposed use was adequate. Finally, based on a license-plate study, Zgonina was of the opinion that drivers would not use the residential streets in Hovland as a short cut. On cross-examination, Zgonina admitted that he did not calculate the number of trips that would be generated by the restaurant, office building and savings and loan, nor did he perform any potential employee or customer interviews to determine from where they would be coming.

Samuel T. Gentles was recognized as an expert in the field of commercial real estate. Gentles testified that the vacancy rate of the existing buildings in Deerfield is 6.7%. Gentles opined that there is a substantial demand for office buildings in Deerfield which could accommodate tenants requiring 1,000 to 1,500 square feet or less and that the proposed use can fill that need. Gentles also believed that the newer office buildings in the Deerfield area would not meet the need for smaller, about 1,000 square feet, office space. Gentles also opined that there were not enough restaurants in Deerfield based on the statistics that the ratio of restaurants to persons in the greater Chicago area is 1:896, while the ratio in Deerfield is only 1:1,600. On cross-examination, Gentles agreed that several office buildings in the Deerfield area had 10% or higher vacancy rates and contained vacant office space smaller than 1,000 square feet. Further, Gentles' count of restaurants did not include the "eating facilities" of hotels or of 9 or 10 office buildings.

Leslie Pollock, a land planner, testified for defendant. Pollock testified that the subject property, as zoned R-1, could be divided into 13 lots with a special use. Pollock believed that Lake-Cook Road served an appropriate function in separating the different land uses and acting as a boundary line. Pollock also believed that Wilmont Road is an appropriate dividing line for residential and commercial property. In his opinion, the appropriate land use of the subject property is single-

family residential, detached use. Pollock stated that the busy Lake-Cook and Wilmont Roads would not impact on the potential to develop the subject property for residential uses. As to the proposed use, Pollock opined that the impact upon adjacent uses would be unacceptable. Pollock also testified that the proposed use could be used as an entry wedge and modification of the comprehensive plan. On cross-examination, Pollock admitted that the area includes a sewage treatment plant and a nursing home. Also, the comprehensive plan does not meet the zoning ordinance's requirements for cul-de-sacs.

Francis Lorenz, a recognized expert in the field of real estate appraisal, testified that the subject property was eligible for a special use as a Planned Residential Development which would permit 10,800-square-foot lots, thereby allowing for 12 or 13 lots to be placed on the property. Lorenz opined that the highest and best use of the subject property would be the development of single-family residences. However, he would like to see the special use granted to allow for the 10,800-square-foot lots. Lorenz valued the subject property with the special use at $1.1 million and at $700,000 as zoned R-1 without the special use. Lorenz believed that Wilmont and Lake-Cook Roads were demarcations and opined that the intrusion of a commercial use would have a serious deleterious effect on the value of neighboring residences and on the lifestyles of the people who live in those residences. Lorenz also stated that the proposed use would cause the adjacent residential property to suffer a 10% decrease in value. Lorenz opined that there is a strong demand for single-family housing and that, although there was a general demand for additional office space, the demand was not so great as to require the construction of office space on the subject property. Further, Lorenz stated that the demand for a restaurant was not so great as to require that one be built on this site. On cross-examination, Lorenz admitted that the information he received from the Metropolitan Chicago Office Guide was inaccurate because it did not include single-user office buildings. Although Lorenz agreed that one home which abuts the subject property is vacant, he believed it was vacant because it is over priced. On redirect examination, Lorenz said he believed that a special use for a Planned Residential Development on the subject property would be granted by defendant.

Gerald Lindgren, who was recognized as an expert in the field of traffic engineering, was of the opinion that the location of the driveways on the proposed use will have a significantly adverse effect on traffic movements at the intersection and on both roads. Lindgren stated that it would be virtually impossible to enforce the "no-left-

turn" restriction. Lindgren also testified that the proposed use would generate the most traffic during the secondary peak-traffic period. Lindgren stated that the proposed plan does not meet proper traffic engineering standards, that people will take short cuts through residential areas, and that the significant problems in entering and exiting the proposed use would cause traffic hazards. On cross-examination, Lindgren admitted that the amount of traffic that would be generated by the occupiers of office space in the proposed use is not significant compared to the traffic produced by the offices on the south side of Lake-Cook Road and the west side of Wilmont Road. Lindgren also admitted that he did not conduct a study to determine if people would use short cuts. On redirect examination, Lindgren stated that the preference is not to have driveways in turning lanes and that the nature and function of the traffic movements are more important than the volume of traffic.

Barbara Houpt, director of community development for defendant, stated that the last revision of the comprehensive plan was in April 1985. All the comprehensive plans since the 1950s have provided that the subject area should be zoned for single-family use. Houpt stated that the area was zoned R-1 with minimum lot sizes of 20,000 square feet, but special provisions allow for lot sizes of 10,800 square feet. If an application for such a special use were made, it would probably be granted. Houpt also noted that there had been other suits in the past to change the zoning on the subject property. Houpt acknowledged that she had received several inquiries about developing the subject property for single-family residences. Houpt testified that, even if the subject property were zoned C-2 for commercial use, a special use would be required to operate the restaurant because the proposed use does not meet defendant's parking ordinances. Houpt was of the opinion that the subject property should be used for single-family purposes and that the development on the south side of Lake-Cook Road has very little, if any, impact on the suitability of the subject property for single-family use because those structures are a substantial distance away from the property. Finally, Houpt stated that defendant has never granted any use other than some type of residential use in the Hovland subdivision. On cross-examination, Houpt agreed that prior to 1978 the comprehensive plan indicated that the land south of Lake-Cook Road was for single-family use.

Several homeowners whose homes are near or abut the subject property testified that their homes ranged in price from $125,000 to $364,000 at the time they bought their homes, and currently the homes are valued between $300,000 and $600,000. They also testified

that they investigated the zoning in the area before they purchased and would not have purchased their homes if they knew the proposed use would be allowed. They also testified that they believed their homes would depreciate by approximately 10%.

In rebuttal, Joseph Abel stated that if 13 lots were placed on the subject property, seven of those lots would not meet the minimum requirement of 10,800 square feet, and two lots would not meet the width requirement. He also testified that the cul-de-sac serving the 13 lots would be 640 feet and the maximum length allowed by the Village ordinance is 300 feet. Also, the diameter of the cul-de-sac would be too small. Abel then testified that if 12 lots were placed on the subject property, five would not meet the footage requirement and two would not meet the width requirement. Moreover, the cul-de-sac would be 578 feet long. On cross-examination, Abel admitted that defendant has approved cul-de-sacs greater than 300 feet and that it is possible to have a plan which conforms to the zoning requirements.

After noting that there was no doubt that the subject property would be worth more if zoned for commercial use rather than R-1 residential or if zoned pursuant to a Planned Residential Development, the trial judge stated that the proposed use would have a much more substantial impact than the offices currently across Wilmont and Lake-Cook Roads. The trial judge also stated that any hardship argument is lessened because Prodromos knew of the zoning and prior attempts to change it. The trial judge then recited eight factors and determined that plaintiff had failed to overcome the presumption of validity by clear and convincing evidence and that there appeared to be a reasonable difference of opinion which could not be resolved in favor of plaintiffs. The trial judge also determined that the proposed use was not reasonable because the proposed plan allows for the property to be used for long hours during the entire week. Finally, the trial judge noted that zoning must begin and end somewhere and that Lake-Cook Road and Wilmont Roads are obvious and real lines of demarcation.

Plaintiffs raise three issues on appeal: (1) whether the trial court improperly relied on the possible rezoning of the subject property in finding that the current zoning was reasonable; (2) whether the trial court's decision was against the manifest weight of the evidence because the trial court improperly applied the appropriate factors utilized in determining the validity of a zoning ordinance; and (3) whether the proposed use for the subject property is reasonable.

Plaintiffs first contend that the trial court's opinion and defendant's position below both tacitly acknowledged that the existing R-1

residential zoning is unreasonable. Plaintiffs assert that throughout the trial judge's oral opinion, which was explicitly made part of the written order, he referred to the possibility of a Planned Residential Development use for the subject property. Further, plaintiffs note that one of defendant's experts, Francis Lorenz, testified that the highest and best use of the subject property would be a residential development with 10,800-square-foot lots, and Leslie Pollock, another of defendant's experts, testified that a residential development with 10,800-square-foot lots would be appropriate. Plaintiffs cite the case of *Stalzer v. Village of Matteson* (1973), 14 Ill. App. 3d 891, 303 N.E.2d 489, for the proposition that the trial court must look to the *existing* zoning of the subject property and not an alternative zoning classification. The *Stalzer* court stated that, once the invalidity of the existing ordinance is established, the plaintiff is not obliged to prove the invalidity or unreasonableness of an alternative zoning classification. *Stalzer*, 14 Ill. App. 3d at 903, 303 N.E.2d at 498.

■ Defendant first responds that the trial court can consider alternative plans when determining the reasonableness of a proposed use, even if the alternative plans were not permitted by the underlying zoning classification, and cites *Pillman v. Village of Northbrook* (1978), 65 Ill. App. 3d 40, 382 N.E.2d 399, and *American National Bank & Trust Co. v. City of Chicago* (1964), 30 Ill. 2d 251, 195 N.E.2d 627. However, alternative plans for a subdivision may be a factor only in determining the question of whether a plaintiff's proposed use is the best possible use for the land (*Gunderson v. Village of Hinsdale* (1987), 156 Ill. App. 3d 92, 102, 508 N.E.2d 1212); the plans may not be used for determining the validity of the existing zoning.

Defendant also responds that the R-1 zoning classification specifically contains provisions for a Planned Residential Development on the subject property. The Deerfield ordinance provides that a Planned Residential Development is a permitted special use for the Hovland community, the area bounded by Wilmont, Hackberry, Willow and Lake-Cook Roads. Under the R-1 classification, the ordinance provides the following:

"4.1—3 *Special Uses*

The following uses are permitted in the R-1 Single-Family Residence District when authorized in accordance with the procedures for Special Uses as set forth in Article 13:

* * *

6. *Planned Residential Developments*, in that area bounded by Lake-Cook Road, Wilmont Road, Hackberry Road and Wil-

low Avenue as regulated by Article 12.3, Planned Residential Developments." Deerfield, Ill., Zoning Ordinance, ch. 4, par. 4.1—3 (1978).

■ Therefore, contrary to plaintiffs' assertions, the testimony regarding the Planned Residential Development and the trial judge's reliance on a possible Planned Residential Development were not based on the possibility that the subject property would be rezoned. If a Planned Residential Development were approved, the zoning of the subject property would remain R-1 and no rezoning would occur. Thus, the trial court did not err by considering the possibility of a Planned Residential Development because a Planned Residential Development was explicitly provided for under the existing zoning which was being challenged. Further, the probability that the Planned Residential Development would require the consent of defendant and some variations does not render the consideration of the Planned Residential Development inappropriate when there was substantial testimony that defendant would consent to the Planned Residential Development as special use and had allowed variations in the past. See *Gunderson*, 156 Ill. App. 3d at 102, 508 N.E.2d at 1219.

The next issue plaintiffs raise is whether the trial court's decision that the existing R-1 zoning is reasonable was against the manifest weight of the evidence.

■ Initially, plaintiffs contend that defendant and the trial judge improperly focused on the entire Hovland area rather than the subject property. It appears that plaintiffs are complaining that the trial judge placed too much emphasis on the character of the Hovland area, the area north and east of the subject property. However, plaintiffs themselves attempt to emphasize the area to the west and south as showing the character of the subject property. In determining whether a particular zoning classification is reasonable, all the facts must be considered. (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47, 145 N.E.2d 65.) Thus, the trial judge must look not only to the commercial area which plaintiffs emphasize but also to the Hovland area. See *Palatine National Bank v. Village of Barrington* (1988), 177 Ill. App. 3d 839, 852, 532 N.E.2d 955.

Individuals challenging an ordinance must first establish the invalidity of the existing zoning ordinance and then show that the proposed use for the subject property is reasonable. (*Schultz v. Village of Lisle* (1972), 53 Ill. 2d 39, 41, 289 N.E.2d 614; *Gunderson*, 156 Ill. App. 3d at 101, 508 N.E.2d at 1219.) In *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65, our supreme court listed six factors which must be considered in determining if an

ordinance is reasonable. These are the following: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which the destruction of the value of plaintiff's property promotes the health, safety, morals, or general welfare of the public; (4) the relative gain to the public compared to hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purposes; and (6) the length of time the property has been vacant as zoned, considered in the context of land development in the vicinity. (*La Salle National Bank*, 12 Ill. 2d at 46-47, 145 N.E.2d at 69; see also *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 311, 469 N.E.2d 183.) Although the supreme court in *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 378, 167 N.E.2d 406, added two more factors to be considered—community need for the proposed use and the care with which community had undertaken to plan its land use development—plaintiffs have not addressed these factors.

██ █ A zoning ordinance, as a legislative judgment, is presumptively valid. (*La Salle National Bank*, 12 Ill. 2d at 46, 145 N.E.2d at 69.) When there is room for a legitimate difference of opinion concerning the reasonableness of an ordinance or when the question of reasonableness is fairly debatable, the courts will not interfere with the legislative judgment. (*Cech Builders, Inc. v. Village of Westmont* (1983), 118 Ill. App. 3d 828, 830, 455 N.E.2d 817; see also *La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 428, 312 N.E.2d 625.) A zoning ordinance may be valid in general, but invalid as to a particular piece of property (*Petropoulos v. City of Chicago* (1955), 5 Ill. 2d 270, 125 N.E.2d 522), as is contended here. The party challenging the zoning bears the burden of proving by clear and convincing evidence that the application of the ordinance to the property is unreasonable and arbitrary and bears no substantial relation to public health, safety, morals or welfare. (*Cosmopolitan National Bank*, 103 Ill. 2d at 310, 469 N.E.2d at 187.) A reviewing court cannot overturn a trial court's findings of fact unless the findings are against the manifest weight of the evidence. (*Cosmopolitan National Bank*, 103 Ill. 2d at 318, 469 N.E.2d at 191.) The trier of fact is in a better position to determine the credibility to be accorded witnesses and their opinions. (*Illinois National Bank & Trust Co. v. County of Winnebago* (1960), 19 Ill. 2d 487, 495, 167 N.E.2d 401.) An appellate court should not reverse a trial court simply because the appellate court might have reached a different conclusion based on conflicting evidence pre-

sented at trial. *Bank of Elk Grove v. City of Joliet* (1988), 167 Ill. App. 3d 457, 461, 521 N.E.2d 648.

■■ The first factor—the existing uses and zoning of nearby property—is of paramount importance. (*Gunderson*, 156 Ill. App. 3d at 103, 508 N.E.2d at 1219-20; see also *La Grange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 309, 388 N.E.2d 388.) Plaintiffs make basically three arguments that the consideration of this factor weighs against the current zoning classification. First, plaintiffs emphasize the volume of traffic on Lake-Cook and Wilmont Roads, particularly at the intersection. Second, plaintiffs contend that the nearby business and commercial use establishes the character of the area. Third, plaintiffs again assert that the trial court improperly considered the Planned Residential Development.

Plaintiffs contend that the traffic on Lake-Cook and Wilmont Roads, especially at their intersection, shows that the property is not appropriate for residential use. Plaintiffs argue that both Lake-Cook and Wilmont Roads are heavily travelled roads and that, because of the volume of traffic, only a small percentage of the land fronting Lake-Cook or Wilmont Roads is used for residential development. Defendant contends that Lake-Cook and Wilmont Roads are proper dividing lines between zoning districts.

Plaintiffs cite several cases for the proposition that the traffic and the nearby commercial use establish the character of the area. However, these cases are distinguishable because, unlike here, none of those cases involve a corner of an entirely single-family residential area. In this case, the area to the north, east, and northeast of the subject property is entirely residential.

Next, plaintiffs contend that the existing 1.5 million square feet of office space in the area establishes the character of the intersection as commercial. Although it is true that there is an enormous commercial use in the area, that use is on the west side of Wilmont Road and the south side of Lake-Cook Road. Again, the case cited by plaintiff, *Illinois National Bank & Trust Co. v. County of Winnebago* (1960), 19 Ill. 2d 487, 167 N.E.2d 401, is distinguishable because, unlike this case, there was no residential use abutting or surrounding the subject property.

Plaintiffs also state, "The first La Salle factor requires the court to rely on the *existing* use and zoning of the Subject Property, not potential uses and zoning." (Emphasis in original.) This statement of law is incorrect. The first *La Salle* factor is "[t]he existing uses and zoning of *nearby property*." (Emphasis added.) (*La Salle*, 12 Ill. 2d at 46, 145 N.E.2d at 69.) Thus, the emphasis under this factor is the

nearby and surrounding property, not the subject property. Also, as discussed above, the existing zoning of the subject property allows for a Planned Residential Development, so defendant and the trial judge were focusing on the existing zoning.

Under this first factor, the evidence is closely balanced. The nearby property is both single-family residential and commercial. All the land to the north and east of the subject property is used for single-family residences. However, almost all the land to the south and west across Lake-Cook and Wilmont Roads is used for commercial development. In this case, Lake-Cook and Wilmont Roads are real lines of demarcation. The nearby property is separated into residential or commercial uses depending on which side of the street the property is located. Streets are reasonable lines of demarcation between residential and other uses, and merely because a property is located on a main traffic artery does not invalidate an ordinance restricting it to residential use. (*Suhadolnik v. City of Springfield* (1989), 184 Ill. App. 3d 155, 175-76, 540 N.E.2d 895.) Because there appears to be a reasonable difference of opinion, the trial court's finding that this factor weighed in favor of the current zoning classification was not against the manifest weight of the evidence.

■■ Although the second factor—the extent to which property values are diminished by the particular zoning restrictions—must be considered, it is not determinative that the property would be worth more if the zoning were reclassified because this would be true in virtually all reclassification cases. (*Grobman v. City of Des Plaines* (1975), 59 Ill. 2d 588, 595-96, 322 N.E.2d 443.) Plaintiffs contend, however, that the trial judge misconstrued this second factor and looked at only the value of the property as currently zoned, rather than focusing on the difference between the value as currently zoned and the value as zoned as proposed. This contention is without merit. The trial judge specifically stated the following:

> "The testimony of Mr. O'Brien in court was that the proposed zoning would make the property value $1,400,000 compared to R-1 at $360,000 and PRD [Planned Residential Development] at $700,000, and so there would be a loss of either $1,040,000 or $700,000. Mr. Lorenz stated that he believes the property developed as a PRD would be worth approximately $1.1 million, and I believe that testimony and its corollary that each of the 12 lots would then be worth something just less than $100,000. In my view, the value of the zoning as a PRD of at least $700,000 or perhaps as much as $1.1 million is a substantial

value that does not deprive petitioner of the use of his property.

Therefore, the trial judge looked at the difference between what the property would be worth as currently zoned and as proposed.

Furthermore, it should be noted that the trial judge also considered the fact that Prodromos bought the property knowing it was classified as R-1 and knowing that the previous owner had tried unsuccessfully to rezone the property. This consideration was proper, because purchasers who acquire property with full knowledge of its zoning classification should not expect that the loss in value from the proposed use compared to the current zoning to be persuasive. See *Lapkus Builders, Inc. v. City of Chicago* (1964), 30 Ill. 2d 304, 310, 196 N.E.2d 682; *Suhadolnik*, 184 Ill. App. 3d at 176, 540 N.E.2d at 907; *State of Illinois Medical Center Comm'n v. Peter Carlton at Ogden & Oakley, Inc.* (1988), 169 Ill. App. 3d 769, 780, 523 N.E.2d 1091.

Plaintiffs have merged their discussion of the third and fourth factors as set forth in *La Salle National Bank* and make several arguments under the heading, "General Health, Safety and Welfare and Gain to Public v. Loss to Property Owners."

■ Plaintiffs' first contention is that benefits and detriments to both the nearby residents and the future homeowners who would be living in the subject property under the existing zoning must be considered. As to the nearby residents, plaintiffs argue that, because they can already see the buildings across the street, there is no adverse impact on those residents from the proposed use. Clearly, more than just the sight of the proposed use is at issue. Plaintiffs argue that future residents of the subject property will suffer irreparable detriment because of the amount of traffic at the intersection. Although plaintiffs, contrary to Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)), fail to cite any authority for the proposition that the benefits and detriments of future residents of the subject property must be considered, under the facts of this case plaintiffs' argument is without merit. Residents currently living on property that is near or abuts the subject property would be the best measure for determining the effects of the intersection. However, those residents did not testify to any irreparable detriment to them caused by the intersection.

■ Next, plaintiffs argue that merely because neighboring property owners testified that the value of their properties would depreciate does not require a finding that this factor weighs in favor of defendant, citing *Regner v. County of McHenry* (1956), 9 Ill. 2d 577, 138 N.E.2d 545. Defendant contends that depreciation of surrounding

property is a proper factor in determining the public welfare, citing *Trendel v. County of Cook* (1963), 27 Ill. 2d 155, 188 N.E.2d 668. Defendant also contends that the neighboring property owners purchased their homes relying on the existing zoning, citing a number of cases, including *Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 402 N.E.2d 719. Although these cases appear to be somewhat in conflict, more recent case law seems to have harmonized these propositions. Although a property owner has a right to rely on zoning classifications and courts can consider the opinions of surrounding homeowners as to the depreciation of property values, zoning classifications may still be amended within the limits of the law. (See *Norwood Builders v. City of Des Plaines* (1984), 128 Ill. App. 3d 908, 925, 471 N.E.2d 634; *Kleidon v. City of Hickory Hills* (1983), 120 Ill. App. 3d 1043, 1057, 458 N.E.2d 931.) Thus, the depreciation of neighboring properties and homeowners' reliance on existing zoning are appropriate considerations but, like the second factor, are not determinative of the issue.

Finally, plaintiffs maintain that the trial judge erred in crediting the testimony of defense witness Gerald Lindgren over the testimony of its witness, Joseph Zgonina, in determining the anticipated additional traffic to the residential area by the proposed use. Lindgren's opinion was that the proposed use would result in traffic hazards and congestion and cause people to cut through the residential area. Zgonina's opinion was that the proposed use would not cause traffic hazards and, according to a study which he performed, people were not cutting through the residential area as a short cut. Defendant characterizes Zgonina's testimony as not believable and contends that the trial court properly considered Lindgren's testimony over Zgonina's. Because the trial judge is in a better position to determine the credibility of the witnesses and their opinions, the trial judge did not err in finding that this factor weighed in favor of defendant. Furthermore, although not argued by defendant, it should be noted that plaintiffs heavily rely on Zgonina's study. However, that study tested whether people were currently using the residential roads as a short cut, not whether people would be using the residential roads as a short cut after the proposed use is installed.

Although not argued by plaintiffs under this heading, the fourth factor is basically a balancing test. The gain to the public is weighed against the hardship caused to the owner of the subject property by the existing zoning. In this case, the public gains, including the benefits of keeping the area residential, outweigh the hardship imposed on plaintiffs. The subject property was purchased with full

knowledge of the zoning classification and of the prior attempts to rezone, and there was ample testimony that the area could be developed for residential use.

■■■ As to the fifth factor, plaintiffs contend that the subject property is not suitable for single-family residential use. Again, plaintiffs argue that the trial court could not consider the Planned Residential Development despite the fact that such a use is explicitly allowed under the current zoning. Further, plaintiffs claim that the traffic at this intersection and the length of a cul-de-sac needed to develop this area make the subject property unreasonable for the zoned purposes. However, three witnesses opined that the subject property was suitable for single-family residential development. Further, Barbara Houpt, the director of community development for defendant, testified that she received inquiries about developing the subject property for single-family use and that several cul-de-sacs in the Village exceed the maximum length.

Plaintiffs have failed to discuss the sixth factor: the length of time the property has been vacant as zoned, considered in the context of the land development in the vicinity. In this case, this factor is difficult to apply because Prodromos razed one home that was on the property and moved another home to a nearby lot. He then immediately attempted to rezone the property. Also, the previous owner attempted to rezone the property. Thus, it is difficult to apply this factor because it is conceivable that the property remained vacant in an area of tremendous development due to the owners' attempts to rezone the property. Further, the subject property was not vacant until the Prodromos razed one home and moved another.

From our careful review of the record, we conclude that the trial court's finding that the existing zoning was not unreasonable was not against the manifest weight of the evidence.

■■■ The third issue raised on appeal is whether the proposed use for the subject property is reasonable. We need only briefly address this issue because of our prior conclusion that the zoning ordinance is reasonable. Plaintiffs contend that the proposed use is reasonable for several reasons. First, they contend that the proposed use would be a transition from the commercial use across Wilmont and Lake-Cook Roads to the residential area in Hovland. Second, they contend that the landscaping would make the proposed use suitable because the residents would be unable to see the proposed use. Third, plaintiffs contend that the proposed use would not have an adverse effect on nearby properties. Fourth, the proposed use would not have an ad-

verse effect on the traffic either at the intersection or the residential areas.

Defendant contends that the proposed use is not appropriate as a transition because the restaurant would be located within feet of the residents' backyards and would be operating from 6 a.m. to 10 p.m. Also, defendant contends that the proposed use is inappropriate because it would have an adverse impact on surrounding properties. Defendant further argues that, although Zgonina's study showed that cars currently were not using the residential streets as a short cut, it did not show whether cars would be using residential streets as a short cut after the proposed use is built.

On this record, we are satisfied that the trial court's determination that the proposed use was not reasonable for the subject property was not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

NICKELS and DUNN, JJ., concur.